# STATE OF CONNECTICUT *v.* ANDRES C.*
## (SC 20692)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Dannehy and Bright, Js.**

*Syllabus*

Convicted of the crimes of sexual assault in the third degree and risk of
injury to a child in connection with his alleged sexual abuse of the

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices McDonald, D'Auria, Mullins and Ecker. Thereafter, Justice Dannehy and Chief Judge Bright were added to the panel and have read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

State *v.* Andres C.

complainant, C, the defendant appealed to the Appellate Court, claiming, inter alia, that he was entitled to the disclosure of the content of certain handwritten journals authored by C because they purportedly constituted a "statement" under the relevant rules of practice (§§ 40-13A and 40-15 (1)) and that his rights under *Brady* v. *Maryland* (373 U.S. 83) were violated as a result of the procedures the prosecutors employed to review the journals for exculpatory information. C revealed the existence of the journals for the first time at trial, testifying that she created them in connection with the therapy she was receiving after the abuse and that they concerned her relationship with the defendant and the abuse he had inflicted, among other things. C admitted to defense counsel on recross-examination that she had reviewed a few pages in one of her journals before testifying and that the journals were "the best record" of the abuse. At that point, defense counsel requested the journals "as discovery . . . ." Following an in camera meeting with defense counsel and the prosecutors, the trial court summarized the discussions that had occurred in chambers and ordered the prosecutors to review the journals for C's statements about the sexual abuse allegations and for any exculpatory material, and to disclose such material to the defense. The court stated that, if the prosecutors were uncertain as to whether parts of the journals were exculpatory, the court would review those portions and make a determination. The prosecutors and defense counsel agreed with the court's summary. Thereafter, the prosecutors enlisted the assistance of a Spanish-speaking investigator employed by the state's attorney's office to help review the journals because they had been written in Spanish. The prosecutors explained to the trial court that the investigator had been instructed as to what is "exculpatory" and then represented to the court, on the basis of the investigator's review, that the journals contained no material subject to disclosure under *Brady*. The prosecutors nevertheless turned over four pages from the journals, out of an abundance of caution, for the trial court to review to determine whether any or all of those pages should be disclosed to the defense. Those four pages were translated, after which the trial court determined that one of those four pages should be disclosed, as the content of that page concerned C's allegedly delayed disclosure of the abuse, which was at issue. On appeal, the Appellate Court affirmed the judgment of conviction, concluding that the defendant had waived his claim that he was entitled to the journals under Practice Book §§ 40-13A and 40-15 (1) insofar as defense counsel had agreed to the trial court's summary of the procedure that had been discussed in chambers, and the court rejected the defendant's claim that the prosecutors were constitutionally required to personally review the journals and could not delegate that review to an investigator. The defendant, on the granting of certification, appealed to this court, challenging the Appellate Court's conclusions and urging this court to adopt a prophylactic rule under the United States constitution requiring a prosecutor to personally

State *v.* Andres C.

review any material that first comes to light during trial for, inter alia, exculpatory information. The state asserted, with respect to the defendant's claim under §§ 40-13A and 40-15 (1), that this court should affirm the Appellate Court's judgment on the alternative ground that C's journals were not subject to discovery because C purportedly did not adopt or approve the journals as her "statement" for purposes of those rules of practice. *Held*:

1. This court agreed with the state's alternative ground for affirmance, namely, that C's journals were not subject to disclosure under Practice Book §§ 40-13A and 40-15 (1) because they did not constitute a statement that was adopted or approved by C, and, therefore, this court did not address whether the Appellate Court correctly determined that the defendant had waived his claim concerning disclosure pursuant to those rules of practice:

a. The state's alternative ground for affirmance was reviewable, even though the state did not raise its claim in the Appellate Court or seek permission to raise it in this court pursuant to the relevant rule of practice (§ 84-11 (b)):

It was appropriate to review the state's alternative claim for affirmance under the circumstances of this case because the state could raise the same claim on remand if this court were to grant the defendant's requested relief of remanding the case to the trial court for further proceedings to determine whether the journals constituted a statement and because reviewing the claim would promote judicial economy, as the claim presented a pure question of law, the record was adequate for review, and both parties had briefed the issue.

b. The journals did not constitute a disclosable "statement" under Practice Book §§ 40-13A and 40-15 (1) because C did not adopt or approve the journals as her statement:

Practice Book § 40-13A requires the disclosure of all "statements" concerning the charged offense that are within the possession of the prosecuting authority or its agents, Practice Book § 40-15 (1) defines "statement" as a written statement that the witness signs or otherwise adopts or approves, and, because there was no indication that C signed her journals, the issue with which this court was presented was whether C otherwise adopted or approved those journals.

For a statement to be adopted or approved, there must be some indication that the witness has vouched for or intends to be accountable for the content of the statement, and, unlike statements given to law enforcement officers or government agents, diaries or similar personal writings typically are not created with the intent of fully and accurately describing the author's recollection of the events in question and with the under-

State *v.* Andres C.

standing that the author may be held accountable in court for the veracity of the statements contained therein.

In the present case, there was no indication in the record that C vouched for or intended to be held accountable for the content of her journals such that she adopted or approved of it, as she did not embrace the content of her journals as her statement of the abuse, there was no evidence that she expected the content of the journals to be communicated or transmitted to anyone else, and her acknowledgment that the journals were "the best record" of the abuse was merely an affirmative answer to a question posed by defense counsel.

Moreover, C did not maintain the journals with the primary purpose of accurately memorializing her recollection of the abuse but, instead, testified that the journals had been maintained as part of a therapeutic exercise undertaken at the direction of a mental health professional, and C also testified that some portions of the journals were not meant to be factual but, rather, consisted of hypotheticals and counterfactuals describing events that had never occurred.

Furthermore, although C suggested that some portions of the journals contained her recollection of the abuse and that those portions were "the best record" thereof, that did not mean that she was knowingly adopting the journals as a formal statement or that she knew or reasonably should have known from the circumstances surrounding defense counsel's questioning of her that she could be held accountable in court for any omissions or inaccuracies in the journals or that they could be used for cross-examination and impeachment purposes.

Rather, C reasonably could have believed that her journals were "the best record" of what had happened, even if she would have been unwilling to stand by them in court because they omitted facts or contained inaccuracies or fabrications.

In addition, although C agreed to provide her journals to the prosecutors for review, she did so at the trial court's request, and nothing suggested that she did so with the intent to provide information about the sexual abuse or with the knowledge that she could be held accountable for the completeness and factual accuracy of the content of the journals.

2. The Appellate Court correctly concluded that the *Brady* review of C's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate, and this court declined the defendant's request to adopt a prophylactic rule under the federal constitution requiring a prosecutor to personally review for exculpatory and impeachment information any material that first comes to light during trial:

The limited case law concerning whether a prosecutor may delegate his or her duty to review material for information that must be disclosed

JUNE, 2024 349 Conn. 300

State *v.* Andres C.

pursuant to *Brady* suggested that such delegation is not constitutionally prohibited and that a prosecutor does not have a constitutional obligation to personally review the material to determine whether disclosure is required.

The defendant's claim for a prophylactic rule, however, was premised on the fact that, because the existence of C's journals was not disclosed until trial, the prosecutors were uniquely qualified to determine whether the journals contained exculpatory or impeachment evidence and, therefore, had a duty to personally review the journals rather than enlisting the assistance of staff, and, although this court agreed with the defendant that familiarity with a witness' testimony is necessary to make a determination as to whether particular evidence is subject to disclosure under *Brady*, it concluded that a prophylactic rule was not necessary because it perceived no significant risk that, in the absence of such a rule, the constitution would be violated.

This court determined that the defendant's proposed rule was unnecessary and unwarranted because there already was a sufficient safeguard, specifically that, when potentially exculpatory information comes to light during trial, a defendant or counsel may request production of the information and make a preliminary showing that the specific information in question contains material, favorable evidence, and, if the prosecutor reviews the information and claims that it contains no evidence subject to disclosure under *Brady*, the defense can request an in camera review of the information by the trial court.

Moreover, the defendant's proposed rule improperly assumes that only the prosecutor handling the trial will have the requisite familiarity with the proceedings, ignores the fact that experienced individuals other than the trial prosecutor may possess that familiarity, and could cause extraordinary delays in the trial depending on the volume of the information at issue, and there was no reason to believe that the proposed rule was necessary on the ground that the risk of a constitutional violation is sufficiently great that simple case-by-case enforcement is inadequate, the defendant having pointed to no evidence that prosecutors or courts are experiencing difficulty determining in particular cases whether an individual other than the trial prosecutor is qualified to conduct a review for *Brady* material.

Furthermore, although the defendant claims that this court cannot have confidence that the investigator who conducted the *Brady* review in the present case was properly instructed about *Brady*'s requirements, the defendant did not expressly raise a freestanding claim that this particular delegation of *Brady* review was improper because the investigator was not adequately trained to conduct a review for *Brady* material or was not sufficiently familiar with the facts of the case.

State *v.* Andres C.

Nonetheless, this court emphasized a prosecutor's unique obligations in the judicial system, as well as the prosecutor's ultimate responsibility for complying with *Brady* and ensuring in the first instance that the principles of justice that underlie *Brady* are fully served, and indicated that it is the better practice for prosecutors to personally review the information at issue, or at least to seek assistance from other attorneys or qualified staff who have received comprehensive training in the requirements of *Brady* review and who are sufficiently knowledgeable about the case at hand to appreciate the import of the information under review.

(*One justice concurring separately; one justice concurring and dissenting; one justice dissenting*)

Argued January 11, 2023—officially released June 18, 2024

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the third degree, sexual assault in the fourth degree, and risk of injury to a child, brought to the Superior Court in the judicial district of New Haven and tried to the court, *Alander, J.*; judgment of guilty of sexual assault in the third degree and risk of injury to a child, from which the defendant appealed to the Appellate Court, *Moll, Alexander*, and *DiPentima, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Richard Emanuel*, for the appellant (defendant).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Mary A. SanAngelo* and *Brian K. Sibley, Sr.*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Andres C., was convicted, after a court trial, of sexual assault in the third degree and risk of injury to a child. During the complainant's testimony at trial, she revealed that, after the assaults, she had engaged in therapy, and, during that

State *v.* Andres C.

therapy, she had kept journals, in Spanish, in which she had written about, among other things, her relationship with the defendant and his sexual abuse of her. Following this revelation, defense counsel requested that the trial court review the journals for potential statements and exculpatory information that should be disclosed to the defendant. After a discussion with the court about this revelation, the parties agreed that the complainant would provide the journals to the prosecutor,[1] and, because the journals were written in Spanish, the prosecutor would enlist the assistance of a Spanish-speaking investigator on her staff to help review the journals. On the basis of the investigator's review, the prosecutor represented to the court that there was no material in the journals that was subject to disclosure under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Out of an abundance of caution, however, she submitted four pages of the journals to the court for its review, indicating that she thought the pages were subject to General Statutes § 54-86f, the rape shield statute. Those four pages were translated into English and reviewed by the trial court, and the court disclosed one page to the defendant as potential impeachment material.

The defendant appealed to the Appellate Court. He alleged that (1) he was entitled to disclosure of the complainant's journals as the discoverable statements of a witness; see *State* v. *Andres C.*, 208 Conn. App. 825, 851, 266 A.3d 888 (2021); and (2) the prosecutor violated her *Brady* obligation by not personally reviewing the journals for *Brady* material but instead delegating that duty to the investigator. Id., 855. The Appellate Court affirmed the judgment of conviction. Id., 861. The court concluded, first, that the defendant had waived his claim that he was entitled to disclosure

---

[1] The case was tried by two prosecutors, Mary A. SanAngelo and Brian K. Sibley, Sr. When we refer to "prosecutor" in the singular, we are referring to SanAngelo.

State *v.* Andres C.

of the contents of the complainant's journals; id., 851–52; and, second, that the prosecutor did not violate *Brady* by delegating the review of the journals to the investigator. Id., 855, 860–61.

We then granted the defendant's petition for certification to appeal to this court, limited to the following issues: (1) "Did the Appellate Court incorrectly conclude that the defendant had waived his claim that he was entitled to disclosure of the contents of the complainant's journals as the discoverable statements of a witness?" And (2) "[d]id the Appellate Court incorrectly conclude that the *Brady* review . . . of the complainant's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate?" (Citation omitted.) *State* v. *Andres C.*, 342 Conn. 901, 270 A.3d 97 (2022). We resolve the first question on the alternative ground that the journals were not discoverable statements. We also conclude that the Appellate Court correctly concluded that the prosecutors were not constitutionally obligated to personally review the complainant's journals for *Brady* material. Accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following facts that the trial court reasonably could have found and procedural history. "When [the complainant] was ten years old, [she], along with her mother and siblings, moved into her grandmother's home. Shortly thereafter, the defendant, the [complainant's] uncle, moved in. At some point, during the time that the [complainant] and the defendant were living at the grandmother's house, the defendant . . . had the [complainant] apply lotion to his penis and masturbate him. . . . This type of abuse occurred more than ten times over the next two years while the [complainant] lived at her grandmother's house and continued after she had moved to another house.

"The [complainant] described other instances of inappropriate behavior by the defendant. On one occasion, the defendant, while dressed only in boxer shorts, went into the [complainant's] bedroom, got under the covers with her, and rubbed the [complainant's] stomach and legs under her shirt and pajama bottoms. After the [complainant] had moved to another house, she would, on occasion, sleep over at her grandmother's home. During several of these occasions, the defendant got into bed with the [complainant] and rubbed himself against her so that she felt his penis against her back.

"A few years later, the then sixteen year old [complainant] began speaking with a therapist [Milagros Vizueta], and she disclosed the sexual abuse during her first session. At a therapy session attended by her mother and brother, the [complainant] disclosed the sexual abuse by the defendant. Thereafter, on October 28, 2015, the [complainant] reported the defendant's conduct to the police. The defendant was [subsequently] arrested . . . ." *State* v. *Andres C.*, supra, 208 Conn. App. 828–29.

On the first day of trial, the complainant testified that, during her therapy sessions with Vizueta, "Vizueta occasionally took notes and would write down things for the [complainant] to 'work on . . . .' During redirect examination, the prosecutor inquired whether the [complainant] ever had seen her records from the therapy [sessions] with Vizueta. The [complainant] responded: 'I have my journals. . . . I don't have—I don't know her records, but I have my journals.'[2] Upon further inquiry, the [complainant] stated: 'For the journals, [Vizueta] would have me write a lot about either my relationship to [the defendant], with [the defendant],

_____

[2] The Appellate Court noted that, "[o]n the basis of [its] review of the transcripts, it appear[ed] that neither the prosecutors nor defense counsel had been aware of these journals until the [complainant] mentioned them during her testimony." *State* v. *Andres C.*, supra, 208 Conn. App. 845 n.11. We agree.

State *v.* Andres C.

how the abuse happened. I would reflect a lot on how it made me feel, how I was missing, why I didn't want to talk. Sometimes in the journal we'd write about— like if I was having family fights, so my journals are the abuse that I lived with him, but also family fights with my siblings and my mom.' The [complainant] also stated that the journals were her 'words through therapy.'

"On recross-examination, defense counsel inquired ['prior to coming here, did you read your journals?'] . . . The [complainant] responded that she had looked at a 'few pages' in one of her journals. The following colloquy between the [complainant] and defense counsel then occurred:

" 'Q. Okay. Were those—and the—the journals that you have, are those your notes that [you] wrote at the time things were happening?

" 'A. No, it was while I was in therapy.

" 'Q. Okay. But it was part of the therapy process about what you spoke to the doctor about, what she told you and what happened to you, right?

" 'A. Yes.

" 'Q. And it would be much closer in time to the events that we're talking about; [is that] fair to say?

" 'A. When I was journaling, closer to the abuse, yes.'

" 'Q. Would—would those be the best record you have of what happened? . . .

" 'A. Yes.

" 'Q. Okay. And you still have those journals?

" 'A. Yes.'

"At this point, defense counsel requested an in camera review of the [complainant's] journals. The prosecu-

State *v.* Andres C.

tor objected, arguing that the journals did not constitute medical records but rather were akin to a diary. The [trial] court inquired whether the journals were privileged documents, by statute or common law. The prosecutor then requested time to research the issue. Defense counsel suggested that the court should review the journals for exculpatory material. The court responded that the obligation to review the journals for exculpatory material rested with the prosecutors and that, if there was a claim of privilege, it would conduct an in camera review. Defense counsel responded: 'I am asking for it as discovery; however, I was trying to be as respectful as I could be to the complainant.' The court then suggested a further discussion of this issue in chambers and mentioned the possibility of recalling the [complainant] as a witness, if necessary.

"The next day . . . the [trial] court summarized the discussions that had occurred in chambers: 'I have determined that [the complainant's] journals should be reviewed by the state to determine, what, if anything in those journals [comprised of 3 notebooks totaling approximately 200 pages] . . . comprise statements by [the complainant] concerning the incidents in question here, and any exculpatory material. . . . [U]pon that review [the state] should disclose to defense counsel any such material, specifically, statements made by [the complainant] in her journals concerning the sexual assault allegations here or any exculpatory material, and if there is anything the state is uncertain as to whether it is exculpatory, [the prosecutors] can provide those portions of the journals to me, and I will review them in camera to determine whether they should be disclosed to defense counsel.

" 'It is my understanding that the state has talked to [the complainant]. She has agreed to provide the journals to [the state], they will be provided to the state sometime this afternoon . . . but apparently the jour-

State *v.* Andres C.

nals are in Spanish so the state needs the assistance of someone on [its] staff to interpret those journals so that [it] can fulfill [its] obligation[s] as I've outlined them.' The prosecutors and defense counsel agreed with the court's summary, and neither side raised any objection.

"The next day, the [trial] court placed the following on the record: 'It is my order that the state review those journals to determine if there is any exculpatory information with respect to those journals that need[s] to be disclosed to the defendant, and that includes any inconsistent statements and any statements regarding the therapy method used that may have fostered or . . . instructed [the complainant] to use her imagination or [to] speculate or embellish as to what happened, but, basically, the . . . state needs to review those journals under its *Brady* obligations and . . . turn over to the defendant anything that is exculpatory.'[3]

"The [trial] court then confirmed that defense counsel had argued that at least some portions of the journals were subject to disclosure because the [complainant] had reviewed them prior to her testimony. The prosecutor countered that, aside from any *Brady* material, defense counsel was not entitled to review the [complainant's] private journals. The prosecutor further represented that her investigator had started the process of reviewing the 200 pages, which were handwritten in Spanish, and, after several hours of review, had not discovered any exculpatory material. The prosecutor also assured the court that she had given the investiga-

_____

[3] This order appears to be more limited in scope than the trial court's prior order. The prior order called for the state to review the journals for statements by the complainant concerning the incidents in question here, and any exculpatory material. This subsequent order relates only to the state's obligation to review the journals for exculpatory information. Whether this subsequent order is merely a refinement of the prior order or a superseding order is not entirely clear. Adding to the lack of clarity is that these orders resulted from discussions in chambers, and we have no record of what those discussions entailed.

State *v.* Andres C.

tor 'very, very clear instructions on what is exculpatory and what is not. [The prosecutor] sat in an office directly next to [the investigator], so, if [the investigator] had any questions at all, she came to [the prosecutor], and there is nothing exculpatory or inconsistent so far at all . . . .'

"The [trial] court then considered the defendant's claim that he was entitled to the journals because the [complainant] had used them to refresh her memory prior to her testimony. After [reviewing] § 6-9 of the Connecticut Code of Evidence, the court stated: 'In light of the fact that [the complainant] testified that she . . . used [only] a few pages of [the] journals that consisted of hundred[s]—at least, apparently, a couple hundred pages, and the fact that the state would be reviewing all the journals with the obligation to turn over any exculpatory evidence to the defendant, I am not going to order that the entire journals be turned over to the defense for examination, also, in light of the private nature of those journals.' The court indicated it would make the journals a court exhibit, and the parties noted their agreement that a translation was not necessary at that point."[4] (Footnote added; footnote altered.) Id., 844–48.

"On the next day of trial . . . the prosecutor indicated that the investigator had completed the review of the [complainant's] journals.[5] Pursuant to General

---

[4] Specifically, the trial court stated that the parties had "agreed in chambers that [the journals do not] need to be translated . . . ." In response, defense counsel stated, "[c]orrect."

[5] "The prosecutor represented the following to the court: 'These records . . . were reviewed by my office, specifically . . . [by] . . . an investigator for the state's attorney's office. She has been with the state's attorney's office for fifteen years, she has been an investigator in our office for five years, she is bilingual, [and] she is a 2013 graduate of Albertus Magnus College with a major in [c]riminal [j]ustice. She was instructed by [the prosecutors] as far as what she was looking for, [and] we explained to her very carefully what the state's obligation is for exculpatory and *Brady* material.

" 'She indicated that she spent about ten hours reviewing these materials because they are in Spanish, and she took her time. These materials never left

State *v.* Andres C.

Statutes § 54-86c (b),[6] the prosecutors submitted, in a sealed envelope, four pages from the journals for review by [the trial] court . . . . In their view, the contents of these four pages were protected by . . . § 54-86f,[7] but, '[out of an] abundance [of] caution,' [the prosecutors] sought a judicial determination as to whether these items should be disclosed to the defense.

"Later that day, the [trial] court indicated that it had reviewed the four pages from the journals submitted by the prosecution and determined that one page should be disclosed to the defense. Specifically, the court stated: 'One of the material issues in this case is . . . [the complainant's] claim that she delayed disclosure of the alleged assaults by the defendant because, when [the complainant's cousin, D] reported such assaults,[8] the family rallied behind the defendant, and she felt

the state's attorney's possession; they did not go to her home, [and] they were [reviewed] during business hours. She indicated that she spent about ten hours reviewing them, and, whenever she had any questions, she would talk to [the prosecutors] . . . .' " *State* v. *Andres C.*, supra, 208 Conn. App. 848–49 n.12.

[6] General Statutes § 54-86c (b) provides: "Any state's attorney, assistant state's attorney or deputy assistant state's attorney may request an ex parte in camera hearing before a judge, who shall not be the same judge who presides at the hearing of the criminal case if the case is tried to the court, to determine whether any material or information is exculpatory."

"In the present case, the parties agreed that [the trial court] could review the four pages from the [complainant's] journals to determine whether there was any exculpatory material contained therein." *State* v. *Andres C.*, supra, 208 Conn. App. 849 n.13.

[7] General Statutes § 54-86f provides in relevant part: "(a) In any prosecution for sexual assault under sections 53a-70, 53a-70a and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ."

[8] The state presented evidence at trial that the defendant had also sexually abused D. *State* v. *Andres C.*, supra, 208 Conn. App. 829.

State *v.* Andres C.

that there was no one she could report [those] assault[s] to and be supported. . . . There is an incident [recorded in one of the journals in which] she disclosed a claim of sexual abuse to her mother, which could be interpreted as the mother then supporting her claim. So, I think it is material and exculpatory, so I will order it disclosed to the defendant.'

"[Thereafter], the [trial] court granted the defendant's motion to recall the [complainant] as a witness. During redirect examination by the prosecutor, the [complainant] explained that, following a prompt from Vizueta, she wrote a passage in her journal about what 'an environment in which speaking about abuse should have looked like, instead of what [she] grew up in.' Thus, the statements in her journal in which the [complainant] wrote that she had disclosed a sexual assault by a different family member to her mother [were] hypothetical in nature and part of a therapy exercise, and not based on actual events." (Footnote added; footnotes altered; footnote in original.) Id., 848–50.

Subsequently, the trial court found the defendant guilty of sexual assault in the third degree and risk of injury to a child and not guilty of sexual assault in the fourth degree, and rendered judgment accordingly. Id., 829. The trial court sentenced the defendant to a total of twenty years of incarceration, execution suspended after twelve years, and fifteen years of probation. Id. The defendant appealed to the Appellate Court, claiming, inter alia, that "he was entitled to the contents of the [complainant's] journals because they constituted a statement pursuant to Practice Book §§ 40-13A and 40-15 (1)"; id., 851; and that "his rights under *Brady* . . . were violated as a result of the procedures employed by the prosecutors with respect to the review of the [complainant's] journals for exculpatory information." (Citation omitted.) Id., 855. The Appellate Court concluded that the defendant (1) had waived his first claim

State *v.* Andres C.

insofar as defense counsel had agreed to the trial court's summary of the procedure that the parties had discussed in the trial court's chambers; see id., 854–55; and (2) had failed to demonstrate that the prosecutors could not constitutionally delegate the review of the journals to an investigator but were required to personally review the journals. See id., 855, 860–61. Accordingly, the Appellate Court affirmed the judgment of conviction. Id., 861.

This certified appeal followed. The defendant argues on appeal that the Appellate Court incorrectly resolved both claims. The state disagrees but also argues, with respect to the defendant's claim pursuant to Practice Book §§ 40-13A and 40-15 (1), that we should affirm the judgment of the Appellate Court on the alternative ground that the complainant's journals are not discoverable because they do not constitute a "statement" for purposes of those rules. The defendant counters that the state's alternative ground for affirmance is not reviewable because the state did not raise it in the Appellate Court and did not seek permission to raise it in this certified appeal. See Practice Book § 84-11 (b).[9]

We conclude that, under the specific circumstances of the present case, we may review the state's unpreserved alternative ground for affirmance. In doing so, we conclude that the complainant's journals were not

_____

[9] Practice Book § 84-11 (b) provides: "Within ten days of the filing of the appeal, the appellee may file a statement of alternative grounds for affirmance or adverse rulings or decisions to be considered in the event of a new trial, provided that such party has raised such claims in the Appellate Court. If such alternative grounds for affirmance or adverse rulings or decisions to be considered in the event of a new trial were not raised in the Appellate Court, the party seeking to raise them in the Supreme Court must move for special permission to do so prior to the filing of that party's brief. Such permission will be granted only in exceptional cases where the interests of justice so require."

Although Practice Book § 84-11 was amended in 2022, those amendments, which took effect on January 1, 2023, have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current version of that rule.

State *v.* Andres C.

subject to discovery under Practice Book §§ 40-13A and 40-15 (1) because the complainant did not adopt or approve them as her statement. Consequently, we need not decide whether the Appellate Court correctly determined that the defendant waived this claim.[10] With respect to the defendant's second claim, we conclude, on the basis of the record in the present case, that the state did not violate its obligations under *Brady* and that there is no justification for the constitutional prophylactic rule proposed by the defendant.

I

The defendant first contends that the Appellate Court incorrectly determined that he waived his claim that he was entitled to disclosure of the complainant's journals under Practice Book §§ 40-13A and 40-15 (1) insofar as defense counsel had agreed to the procedure outlined by the trial court after the discussion in the trial court's chambers. As mentioned, we need not address this claim because, regardless of whether the defendant waived the claim, he cannot prevail. Specifically, we agree with the state that the journals were not subject to disclosure under §§ 40-13A and 40-15 (1) because they were not adopted or approved by the complainant.

---

[10] Justice Ecker would conclude that the defendant's claim was not waived, a question that is far more complex than the question of whether the journals constituted a statement. See footnote 5 of the dissenting opinion. Without belaboring the point, we note, for example, that it is unclear from the record whether the trial court's order concerning the scope of the state's *Brady* review was intended to supersede its previous order that the state review the journals for statements or, instead, was intended only to refine its previous order that the state review the journals for exculpatory material. See footnote 3 of this opinion. The state seems to adopt the former interpretation, whereas the defendant appears to adopt the latter. There is nothing in the record, however, to establish that the trial court sought only to refine its prior order as opposed to issuing a new order directed solely at *Brady*. The fact that the subsequent order followed an in-chambers discussion between the parties and the trial court, where the defense acquiesced in the procedure the court laid out regarding how the state would review the records, only further complicates the picture.

State *v.* Andres C.

A

As a preliminary matter, we address the defendant's contention that the state's claim that the complainant's journals do not constitute a disclosable statement is unreviewable because the state did not raise that claim in the Appellate Court and did not seek permission to raise it in this certified appeal, as required by Practice Book § 84-11 (b). We conclude that, under the specific circumstances of the present case, we can and should review the state's claim for two interrelated reasons.

First, the relief that the defendant seeks if we were to agree with his claim is a remand to the Appellate Court with direction to remand the case to the trial court for it to conduct proceedings to determine whether the journals constitute a statement. If we were to grant that relief, nothing would prevent the state from raising on remand the same claim that it has raised on appeal.

Second, the issue of whether a witness' personal journals constitute a disclosable statement within the meaning of the rules of practice presents a pure question of law on this record, the record is adequate for review of the state's claim, and both parties have briefed the issue.[11] We conclude, therefore, that considerations of judicial economy militate in favor of reviewing the

_____

[11] We acknowledge that whether a statement has been adopted or approved for purposes of the rules of practice may be a mixed question of fact and law, with the historical facts subject to review for clear error and the legal question of whether the established subsidiary facts constitute adoption or approval subject to plenary review. See, e.g., *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 264, 112 A.3d 1 (2015). There is no factual issue in the present case because the relevant subsidiary facts—namely, the complainant's statements about the journals during her testimony—are undisputed. See footnote 14 of this opinion. Whether these undisputed statements constituted an adoption or approval of the journals is a question of law. See, e.g., *Bridgeport* v. *Plan & Zoning Commission*, 277 Conn. 268, 275, 890 A.2d 540 (2006) (whether party complied with statutory notice requirements under General Statutes § 8-3 (a) was mixed question of fact and law subject to plenary review when facts were undisputed and dispute concerned "the trial court's application of § 8-3 (a) to those facts").

State *v.* Andres C.

state's alternative ground for affirmance. Cf. *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 171–72, 84 A.3d 840 (2014) ("interests of judicial economy justify appellate review of an unpreserved, alternative ground for affirmance that likely would arise when . . . a decision in favor of the appellant would result in a remand for a new trial").

B

We turn, therefore, to the merits of the state's claim that the complainant's journals do not constitute a disclosable statement under Practice Book §§ 40-13A and 40-15 (1). The state contends that (1) a document or communication qualifies as a statement only if the witness conveyed it to a government agent, which was not true of the complainant's private therapy journals, and (2) the complainant did not adopt or approve of the journals. Because we conclude that the complainant did not adopt or approve her journals, we need not determine whether the statement must be made to a government agent.[12]

We begin with the standard of review. "The interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation. . . . The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary." (Internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 328 Conn. 586, 594, 181 A.3d 550 (2018).

With these principles in mind, we review the language of the rules of practice. Practice Book § 40-13A provides: "Upon written request by a defendant and without requiring any order of the judicial authority, the

_____

[12] We also need not consider whether, for purposes of Practice Book §§ 40-13A and 40-15 (1), an author's written work product constitutes a statement when the author never shared the writing with anyone else.

State *v.* Andres C.

prosecuting authority shall, no later than forty-five days from receiving the request, provide photocopies of all statements, law enforcement reports and affidavits within the possession of the prosecuting authority and his or her agents, including state and local law enforcement officers, which statements, reports and affidavits were prepared concerning the offense charged, subject to the provisions of Sections 40-10 and 40-40 et seq.'' Practice Book § 40-15 provides in relevant part: ''The term 'statement' as used in Sections 40-11, 40-13 and 40-26 means . . . (1) [a] written statement made by a person *and signed or otherwise adopted or approved by such person* . . . .'' (Emphasis added.) We interpret the definition of ''statement'' in § 40-15 (1) also to extend to that term as used in § 40-13A.[13]

Pursuant to Practice Book § 40-15 (1), the complainant's journals constitute a ''statement'' only if she ''signed or otherwise adopted or approved'' the journals. There is no indication that the complainant signed her journals. The issue before us, then, is whether she otherwise adopted or approved the journals.

Because the definition of ''statement'' in Practice Book § 40-15 (1) was borrowed from the federal Jencks Act, 18 U.S.C. § 3500, which sets the requirements for disclosing government witness statements in federal

[13] We acknowledge that Practice Book § 40-15 does not expressly provide that the definition of ''statement'' in that section applies to the word ''statement'' as used in Practice Book § 40-13A but refers to the term only as used in Practice Book §§ 40-11, 40-13 and 40-26. Before the adoption of § 40-13A in 2009; see Practice Book (2010) § 40-13A; Practice Book (2009) § 40-13 (a) (1) required the state to produce ''[a]ny statements of the witnesses in the possession of the prosecuting authority or his or her agents, including state and local law enforcement officers, which statements relate to the subject matter about which each witness will testify . . . .'' That provision was deleted when § 40-13A was adopted. See Practice Book (2010) § 40-13 (a). It would appear that the failure to amend § 40-15 to include a reference to the new section, § 40-13A, was an oversight. In the present case, both parties have assumed that § 40-15 (1) applies to § 40-13A.

prosecutions, this court consistently has relied on the history and judicial interpretations of the Jencks Act when construing § 40-15 and related rules of practice. See, e.g., *State* v. *Johnson,* 288 Conn. 236, 278–79, 951 A.2d 1257 (2008) (looking to federal decisions interpreting Jencks Act to resolve whether Practice Book §§ 40-13 and 40-15 impose affirmative duty on government to create record of witness interviews); *State* v. *Cain,* 223 Conn. 731, 749, 752–53, 613 A.2d 804 (1992) (relying on case law interpreting Jencks Act in construing predecessor to § 40-15 (2)).

Courts have held that, in order to conclude that a statement is adopted or approved under the Jencks Act or rule 26.2 of the Federal Rules of Criminal Procedure, which effectively incorporates the Jencks Act into the federal criminal procedure rules; see, e.g., *United States* v. *Scotti,* 47 F.3d 1237, 1249 (2d Cir. 1995); there must be some indication that the witness has vouched for, or intends to be accountable for, the contents of the writing. See, e.g., *United States* v. *Gotchis*, 803 F.2d 74, 77–78 (2d Cir. 1986). "Not everything a witness has written constitutes his 'statement' within [18 U.S.C.] § 3500 (e) (1)." *United States* v. *Thomas*, 97 F.3d 1499, 1502 (D.C. Cir. 1996). This interpretation is consistent with the public policy principles underlying the Jencks Act. As Justice Lewis F. Powell, Jr., explained in his concurring opinion in *Goldberg* v. *United States*, 425 U.S. 94, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976), "[i]n the ordinary course the [g]overnment in taking statements of . . . witnesses will impress [on] them the probable use of the statements. Congress recognized as much, noting that one reason the [g]overnment takes statements is to tie the witness down so that he will stand by the statement." (Internal quotation marks omitted.) Id., 126 n.16 (Powell, J., concurring in the judgment). He further noted that the "guarantees of dependability that Congress relied [on] . . . arise partly from the

State *v.* Andres C.

sense that a witness normally would have of going on the record when he makes a statement . . . .'' (Footnotes omitted; internal quotation marks omitted.) Id., 126 (Powell, J., concurring in the judgment).

Justice Powell also emphasized the unfairness of holding a witness accountable for a statement that was not made with ''the knowledge that he is formalizing a statement [on] which he may be cross-examined.'' Id., 125 (Powell, J., concurring in the judgment). He observed that, if a statement is ''producible on a showing of less than knowing adoption as a formal statement, honest and reliable witnesses will be postured wrongly before the [fact finder] as having made inconsistent statements. This is unfair to the witness, and it unduly handicaps the [g]overnment's efforts to [successfully prosecute] guilty defendants.'' Id., 128 (Powell, J., concurring in the judgment). Accordingly, ''to protect interests sought to be served by the [Jencks] Act,'' the witness must make and approve the statement ''with the knowledge that he is formalizing a statement [on] which he may be cross-examined.'' Id., 125 (Powell, J., concurring in the judgment); see, e.g., *United States* v. *Gotchis*, supra, 803 F.2d 78 (witness must evince ''an intent to be held accountable for the content of his [statement]'').

''The question of adoption [of a witness' statement] arises [most] frequently in connection with notes taken by a [g]overnment agent while interviewing a witness.'' *United States* v. *Bosier*, 12 M.J. 1010, 1013 (A.C.M.R. 1982); see, e.g., *United States* v. *Valdez-Gutierrez*, 249 F.R.D. 368, 372 (D.N.M. 2007). In such cases, the government agent typically memorializes a summary of the interview and then asks the witness to review the summary for accuracy and completeness and, by signing, to adopt it as his or her own statement. Unlike statements given to a law enforcement officer or other government agent, diaries or similar personal writings, including the

State *v.* Andres C.

"diaries" of an agent or government informant, typically are not created with the intent of fully and accurately describing the author's recollections of the events in question or with the understanding that the author may be held accountable in court for their veracity. On this point, the case of *United States* v. *Melo*, 411 F. Supp. 2d 17 (D. Mass. 2006), is instructive.

In *Melo*, the United States magistrate judge addressed whether a government agent's own rough, handwritten notes, taken while conducting surveillance of the defendant during the investigation, were subject to production under the Jencks Act and rule 26.2 of the Federal Rules of Criminal Procedure. See id., 18. Although the agent testified that the information in the surveillance log was accurate and that he did not put anything in the log that he did not believe to be true, the magistrate nevertheless concluded that the notes were not adopted or approved. See id., 24. In reaching this conclusion, the magistrate observed that, for purposes of the Jencks Act, " '[s]igning' . . . means putting a signature or other mark on the [document] so as to attest to [its] accuracy and to intend to be accountable in a formal manner for [its] contents." Id., 20. The magistrate then concluded that " 'approv[ing]' or 'adopt[ing]' . . . connote[s] the same thing as 'signing.' " Id. In addition, the magistrate observed that there was no indication that the agent intended the notes to be final. See id., 24. Rather, the notes likely contained impressions and interpretations, were not in the nature of a complete recitation that eliminated the possibility of portions being selected out of context, and ultimately were not meant to be a complete account of what was observed during the surveillance. See id., 21–22, 24; see, e.g., *United States* v. *Carrasco*, 537 F.2d 372, 375 (9th Cir. 1976) ("[a] statement, unlike notes or a diary, seeks to transmit information from the declarant to the reader"); *State* v. *Morrison*, 33 Or. App. 9, 16, 575 P.2d 988 (1978) ("[t]o

State *v.* Andres C.

be a statement that can be used for impeachment, there must have been some intent to communicate information to another'').

In the present case, we conclude that the complainant did not formally adopt or approve her journals as required by Practice Book § 40-15 (1). There is no indication in the record that the complainant ''vouched for'' the journals or intended to be held accountable for their contents. *United States* v. *Gotchis*, supra, 803 F.2d 77– 78. She acknowledged authorship. And she agreed with defense counsel's suggestion that the journals were the ''the best record [she had] of what [had] happened . . . .'' But she did not embrace them as her statement of the abuse or in any way indicate that she intended to be held accountable for the contents of the journals. In fact, there is no evidence whatsoever that she even expected that the contents of her private diaries would be communicated or transmitted to anyone else. Confirming the complainant's intent to formally adopt the journals was especially important in a case such as this, in which English is not the complainant's native language and her previously mentioned acknowledgments came only in providing affirmative answers to questions posed by defense counsel.

It is also highly significant that the complainant did not maintain the journals with the primary purpose of accurately memorializing her recollections of the events in question. Instead, she described them as therapeutic journals, her ''words through therapy,'' that she maintained at the direction of a mental health professional to help her process her feelings about the abuse. Indeed, the complainant testified that some portions of the journals, at least, were not factual at all. Rather, they were therapy exercises in which she was encouraged to imagine hypothetical assaults and counterfactual family environments. This is illustrated by the portion of the journals that was admitted into evidence. In that part

State *v.* Andres C.

of her journals, the complainant described herself disclosing the abuse to her mother and depicted her mother as believing her. The complainant testified, however, that these events never happened and that her therapist had instructed her to describe, as a therapeutic exercise, what should have happened if she had disclosed the abuse to her family. The complainant was clear that that account was not intended to be a factual one and that she had not disclosed the abuse to her mother until after it had ceased, while the complainant was in therapy.

Although the complainant's testimony suggests that some portions of the journals contain her recollections of the past abuse, and she indicated that those portions are the "best record" she had of that abuse, that does not mean that she was knowingly adopting the journals as a formal statement. Nor does it imply that she knew or reasonably should have known from the circumstances surrounding defense counsel's questioning of her that she could be held accountable in court for any omissions or inaccuracies in the journals, or that they could be used for cross-examination and impeachment purposes.[14]

---

[14] The defendant seems to suggest that the policy underlying the requirement that the statement be signed, adopted or approved is to ensure that the statement is *authentic*, i.e., that it is what it purports to be. Specifically, he states that the complainant adopted and approved the journals when she "acknowledged under oath that the journals were her own handwritten product, and she described their contents." As we explained, that is not the purpose of the requirement, or at least not the *exclusive* purpose. Signing, approving or adopting is also required to ensure that the witness knows that he or she may be held accountable for the truth and accuracy of the statement in a court of law. The question before us is whether the complainant *did in fact* knowingly adopt or approve the journals as a formal account of the alleged abuse. See *Goldberg* v. *United States*, supra, 425 U.S. 128 (Powell, J., concurring in the judgment) (Jencks Act requires showing of "knowing adoption as a formal statement"). No reasonable fact finder could conclude, on the basis of the record, that the complainant ever had any intent to adopt or approve the journals as her formal statement of the abuse or that she had any knowledge of the consequences of doing so. Simply acknowledging that she had written the journals, even if under oath, is not the equivalent of adopting or approving their contents as a formal statement.

State *v.* Andres C.

Indeed, the complainant reasonably could have believed that her journals were her "best record" of what had happened, even if she would have been unwilling to stand by them in court because they omitted facts or contained inaccuracies or fabrications. As far as the record shows, the journals were her *only* written account of what had happened, and at least part of the account was written for therapeutic reasons, not as a historical record. And nothing in the rules of practice suggests that a defendant is entitled under Practice Book §§ 40-13A and 40-15 (1) to a witness' best record of what happened if the witness did not formally approve or adopt the record as an accurate account of her recollection for which she could be held accountable in court, even assuming that the record was actually accurate and complete. Of course, if the complainant's journals contained impeachment or exculpatory material, that material would be subject to disclosure under

Contrary to Justice Ecker's contention, our conclusion that the existing records do not establish that the complainant adopted or approved the journals as a statement does not mean that we believe that the state was required to formally canvass the complainant to ensure that she knew that she could be held accountable in court for any omissions or inaccuracies in the journals or that they could be used for cross-examination and impeachment purposes. See footnote 9 of the dissenting opinion. It means only that we believe that the evidence must support the conclusion that the complainant knowingly provided the journals to the state as her formal account of the abuse, i.e., that she provided them under circumstances that would reasonably lead her to believe that she would be held accountable for inconsistencies between the journals and her testimony at trial. The fact that the complainant's testimony would support an inference that some portions of the journals in fact contained an accurate account of the abuse is not sufficient.

Finally, contrary to Justice Ecker's suggestion, there is no reason to believe that, even if the journals do not constitute a statement for purposes of Practice Book §§ 40-13A and 40-15 (1), the undisclosed portions of the journals necessarily contain information that is subject to *Brady*. See part I of the dissenting opinion. Any descriptions of the defendant's sexual abuse contained in the journals could be purely inculpatory and consistent with the complainant's trial testimony, and there is no reason to believe that the journals contained "[f]abricated claims of abuse," other than the counterfactual account that was disclosed. Id. Indeed, Justice Ecker himself recognizes that "[i]t is not clear what information the journals contain . . . ." Footnote 26 of the dissenting opinion.

State *v.* Andres C.

*Brady*, regardless of whether the complainant had adopted or approved them as a statement for purposes of the rules of practice.

Finally, in the present case, although the complainant later agreed to provide the journals to the state, nothing in the record suggests that, even then, she did so with the intent to provide information about the offense or with the knowledge that she could be held accountable for the completeness and factual accuracy of their contents under cross-examination in court. Rather, as far as the record shows, the sole reason that she provided the journals to the state was that the trial court asked her to turn them over.

We therefore conclude that the defendant was not entitled to disclosure of the complainant's journals under Practice Book §§ 40-13A and 40-15 (1) because the complainant did not adopt or approve them as her statement.[15]

---

[15] We note that the defendant was not without recourse in this respect. As the state points out, although "[a] criminal defendant has no general constitutional right to discovery"; *State* v. *Fuller*, 178 Conn. App. 575, 582, 177 A.3d 578 (2017), cert. denied, 327 Conn. 1001, 176 A.3d 1194 (2018); the defense could have issued a subpoena duces tecum to the complainant to compel production of any exculpatory or impeachment materials contained in the journals upon making a showing that they could allow the defense to challenge the complainant's credibility. See, e.g., *State* v. *DeCaro*, 252 Conn. 229, 251, 745 A.2d 800 (2000) (defense issued subpoena duces tecum to key state witness); id., 256 n.22 (noting that, "[o]f course, the state does not dispute that [a] subpoena is an appropriate process for the production of documents that are relevant to the matter before the [trial] court" (internal quotation marks omitted)); *State* v. *Wiener*, 58 Conn. App. 203, 207–208, 210–11, 753 A.2d 376 (2000) (defendant has right under due process and confrontation clauses to subpoena records of state witness that would allow defendant to challenge witness' credibility), appeal dismissed, 256 Conn. 223, 772 A.2d 592 (2001). We further note that we are aware of no requirement that a defendant must establish that a witness has signed, adopted or approved a written account of facts related to the witness' testimony that is exculpatory or impeaching or that the witness has provided the account to the state before the defense can issue a subpoena duces tecum seeking to compel *the witness* to produce the writing. We, of course, express no opinion here as to whether the journals in fact contained any information to which the defendant would have been constitutionally entitled if they had been subpoenaed.

State *v.* Andres C.

II

We turn next to the defendant's claim that the Appellate Court incorrectly determined that the *Brady* review of the complainant's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate.[16] Specifically, he contends that, because the existence of the complainant's journals was not disclosed until she testified at trial, the prosecutors were uniquely qualified to determine whether the journals contained impeachment evidence, and, therefore, they had a constitutional obligation to review the journals personally rather than enlisting the assistance of a member of their staff who had not been present during the complainant's testimony to review them. Thus, the defendant argues that this court should adopt a constitutional prophylactic rule requiring a prosecutor personally to review

---

[16] The state contends that, because the complainant's journals were not, and never had been, in the possession of the state when defense counsel learned of their existence during trial and made his initial request for discovery, they could not contain evidence subject to disclosure under *Brady* at that time. See, e.g., *United States* v. *Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) ("the government cannot be required to disclose evidence that it neither possesses nor controls"); *Conyers* v. *Wainwright*, 309 F. Supp. 1101, 1105 (S.D. Fla. 1970) (prosecutor had no duty to discover potentially exculpatory evidence or to make evidence available to defendant, but, once defendant became aware of existence of evidence, defendant had right to compulsory process). But see *United States* v. *Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) ("[when] there is an explicit request for an apparently very easy examination, and a [nontrivial] prospect that the examination might yield material exculpatory information," prosecution should seek out potentially exculpatory information that is not within its possession). The state also suggests that the proper procedure would have been for the defense to issue a subpoena duces tecum to the complainant to compel production of the journals. See footnote 15 of this opinion; see also *United States* v. *Yousef*, 327 F.3d 56, 112–13 (2d Cir.) (defendant could not complain about unavailability of potentially exculpatory evidence when he failed to use procedural tools at his disposal to obtain evidence), cert. denied, 540 U.S. 933, 124 S. Ct. 353, 157 L. Ed. 2d 241 (2003), and cert. denied sub nom. *Ismoil* v. *United States*, 540 U.S. 993, 124 S. Ct. 492, 157 L. Ed. 2d 392 (2003). Both parties, however, appear to have assumed in the proceedings before the trial court that, once defense counsel requested production of the journals and the complainant provided them to the state, any exculpatory or impeachment evidence that they contained was subject to disclosure under *Brady*. Because the state did not raise any claim to the contrary before the trial court, we also assume, for present purposes, that that is the case.

State *v.* Andres C.

material for exculpatory and impeachment information if the material comes to light during trial.[17] We disagree.

We begin our analysis with a brief discussion of the nature of constitutional prophylactic rules and the distinction between such rules and ordinary case-by-case judicial review of constitutional claims. This court has recognized that "courts have the duty not only to craft remedies for actual constitutional violations, but also to craft prophylactic constitutional rules to prevent the significant risk of a constitutional violation." (Emphasis omitted.) *State* v. *Dickson*, 322 Conn. 410, 426 n.11, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017); see, e.g., C. Rogers, "Putting Meat on Constitutional Bones: The Authority of State Courts To Craft Constitutional Prophylactic Rules Under the Federal Constitution," 98 B.U. L. Rev. 541, 545 (2018) (former Chief Justice of Connecticut Supreme Court explaining nature, scope, and purpose of court's power to adopt prophylactic rules). Prophylactic rules "are [forward-looking] and [have the potential to] either sanction future government conduct that is not expressly prohibited by the applicable constitutional provision or require future government conduct that the constitutional provision does not expressly mandate . . . ." C. Rogers, supra, 547. Because constitutional prophylactic rules have this potential to prohibit or to mandate what the constitution does not, their adoption is justified only when the risk of a constitutional violation is high, i.e., when the constitutional

---

[17] The state claims that, because it disclosed the method that it intended to use to review the journals, and defense counsel failed to object to that method, the defendant waived any claim that the method was unconstitutional. We agree with the Appellate Court that the defendant's claim is reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). See *State* v. *Andres C.*, supra, 208 Conn. App. 855–56; see also, e.g., *State* v. *Rosa*, 196 Conn. App. 480, 496–97, 230 A.3d 677 (reviewing defendant's unpreserved *Brady* claim pursuant to *Golding*), cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020).

State *v.* Andres C.

protections are "not by their terms readily applicable in the field"; (internal quotation marks omitted) id., 553; or when case-by-case analysis by the courts is inadequate due to the lack of "judicially manageable standards." Id., 554. Thus, "the authority . . . to create prophylactic rules is not without limits. To the contrary, there is general agreement that [courts] should use this authority cautiously and rules should be as narrowly tailored as possible to accomplish their purpose." Id., 565.

With this general background in mind, we turn to the defendant's claim that prosecutors are constitutionally required to personally review the records that come to light during trial and, therefore, that we should adopt what he characterizes as a narrow prophylactic rule prohibiting prosecutors from enlisting the assistance of anyone other than the trial prosecutor himself to review such records in fulfilling their obligation under *Brady*. Specifically, the defendant asks this court "to adopt an additional layer of prophylaxis to prevent a significant risk of deprivation . . . of a defendant's due process rights under *Brady*." (Citation omitted; internal quotation marks omitted.) In *Brady*, the United States Supreme Court held that "[t]he defendant has a right to the disclosure of exculpatory evidence under the due process [clause] of . . . [the fourteenth amendment to] the United States constitution . . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Citations omitted; internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 736–37, 756 A.2d 799 (2000). "It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) Id., 737. "Whether the

State *v.* Andres C.

[defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 284, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

With respect to the defendant's specific claim in the present case, that a prosecutor be prohibited constitutionally from "delegat[ing]"[18] *Brady* review of information discovered during trial to another, neither the defendant nor Justice Ecker, in his dissenting opinion, has pointed to a single case that prohibits a prosecutor from seeking assistance when material is reviewed to identify discoverable *Brady* information. Indeed, there is limited authority on this point. The authority that does exist regarding delegation suggests that delegation is not constitutionally prohibited. In fact, the defendant acknowledges that there is persuasive authority for the proposition that a prosecutor does not have a constitutional obligation to personally review materials in the government's possession to determine whether disclosure is required under *Brady*. See, e.g., *United States* v. *Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992) ("[w]e have never held that the prosecutor's obligations under *Brady* . . . require the personal effort demanded of the [prosecutor] by the [trial] court"); *United States* v. *Smith*, 552 F.2d 257, 262 (8th Cir. 1977) ("[i]t is unrea-

_____

[18] Although the defendant claims that the prosecutors in this case "delegated" their *Brady* obligations to someone who is not an attorney, and, although some of the case law uses "delegate" to describe similar situations, we think that it is an inaccurate and imprecise term. As we explain subsequently in this opinion, although prosecutors may, in appropriate situations, enlist the assistance of certain nonlawyers to review records for potential *Brady* material, it is ultimately the nondelegable duty and responsibility of the *prosecutor* to disclose exculpatory material to the defense. To the extent other cases use the term "delegation," we understand it to be an imprecise, shorthand way of characterizing the enlistment of another to assist in the review of records for potential *Brady* material. When, and if, we do that in this opinion, we too use it as shorthand terminology.

349 Conn. 300 JUNE, 2024 331

State *v.* Andres C.

sonable to impose [on] a prosecutor the duty of personally searching agency files for favorable evidence''); *Stacy* v. *State*, 500 P.3d 1023, 1038 (Alaska App. 2021) (''the [s]tate can comply with its obligations under *Brady* without having individual prosecutors personally review personnel files'').[19]

The defendant does not claim that these cases were wrongly decided; nor does he challenge the constitutionality of a prosecutor's authority to seek assistance from another person for purposes of reviewing evidence for *Brady* material *before trial*. The defendant does claim, however, that, when potentially exculpatory material comes to light *during trial*, the prosecutor is uniquely qualified to determine whether the material contains exculpatory or impeachment evidence subject to disclosure under *Brady*. He therefore asks this court to adopt a federal constitutional, prophylactic rule requiring the prosecutor personally to review such material.

In support of this claim, the defendant relies on language in two United States Supreme Court cases suggesting that the determination as to whether information in the government's possession constitutes exculpatory or impeachment evidence is best made when the reviewer has access to the complete trial record. See *Kyles* v. *Whitley*, 514 U.S. 419, 439, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (''the character of a piece of evidence as favorable will often turn on the context of

---

[19] See also U.S. Dept. of Justice, Justice Manual, tit. 9, 9-5.002 (Step 2), available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.002 (last visited June 11, 2024) (''It would be preferable if prosecutors could review the information [for *Brady* material] themselves in every case, but such review is not always feasible or necessary. . . . This process may involve agents, paralegals, agency counsel, and computerized searches. Although prosecutors may delegate the process and set forth criteria for identifying *potentially* discoverable information, prosecutors should not delegate the disclosure determination itself.'' (Emphasis in original.)).

State *v.* Andres C.

the existing or potential evidentiary record''); *United States* v. *Agurs*, 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) (for purposes of determining whether material is disclosable under *Brady*, ''the significance of an item of evidence can seldom be predicted accurately until the entire record is complete'').[20] The defendant contends that *Whitley* and *Agurs* support the proposition that, when potential *Brady* material comes to light during trial, only the prosecutor, who has full knowledge of the substance and context of a witness' testimony, is in a position to determine whether the material constitutes impeachment evidence subject to *Brady*.

We do not disagree that familiarity with a witness' testimony is necessary to make a determination as to whether particular evidence is subject to disclosure under *Brady*. However, we do not agree that this fact requires us to adopt a prophylactic rule, under the federal constitution, requiring prosecutors personally to review potentially exculpatory information that comes to light during trial because we perceive no significant risk that, in the absence of such a prophylactic rule, the constitution will be violated. See, e.g., *State* v. *Dickson*, supra, 322 Conn. 426 n.11 (prophylactic rule is justified only when it will ''prevent the significant risk of a constitutional violation'' (emphasis omitted)).

First, the proposed new prophylactic rule is unnecessary and unwarranted because a sufficient safeguard already exists. Indeed, the law already recognizes that,

_____

[20] The defendant also relies on a number of cases holding that prosecutors are charged with the responsibility of determining whether evidence contains *Brady* material, an issue that is not in dispute. As the Appellate Court pointed out, and we agree, it does not follow from the fact that prosecutors are ultimately responsible for ensuring that all exculpatory evidence in the state's possession is disclosed to the defendant that prosecutors cannot seek assistance in complying with that responsibility. See *State* v. *Andres C.*, supra, 208 Conn. App. 859.

349 Conn. 300 JUNE, 2024 333

State *v.* Andres C.

when potentially exculpatory information comes to light
during trial, if defense counsel requests production of
the information and makes some showing that the spe-
cific information in question contains material, favor-
able evidence, and, if, after review by the prosecutor,
the prosecutor claims that the information contains no
evidence subject to disclosure under *Brady*, defense
counsel can request an in camera review by the trial
court. See, e.g., *United States* v. *Agurs*, supra, 427 U.S.
106 ("[a]lthough there is, of course, no duty to provide
defense counsel with unlimited discovery of everything
known by the prosecutor, if the subject matter of . . .
a [specific *Brady*] request [made before or during trial]
is material, or indeed if a substantial basis for claiming
materiality exists, it is reasonable to require the prose-
cutor to respond either by furnishing the information *or
by submitting the problem to the trial judge*" (emphasis
added)); *United States* v. *Prochilo*, 629 F.3d 264, 268–69
(1st Cir. 2011) (if defense counsel can "articulate with
some specificity what evidence he hopes to find in
the requested materials, why he thinks the materials
contain this evidence, and finally, why this evidence
would be both favorable to [the defense] and material,"
and government maintains that requested information
is not disclosable under *Brady*, trial court can conduct
in camera review of information); 6 W. LaFave et al.,
Criminal Procedure (4th Ed. 2015) § 24.3 (b), p. 447
("[i]f the prosecutor refuses to respond to a specific
pretrial request, stating that the material need not be
disclosed under *Brady*, the defense may ask the trial
court to examine the requested items in camera and
order disclosure if it should find the items to be exculpa-
tory and material"). Thus, if the defendant was unsatis-
fied with the prosecutor's representation that the
journals did not contain any exculpatory evidence,
defense counsel could have asked for in camera review
by the trial court at that point, which counsel did not

State *v.* Andres C.

do. In camera review by the trial court of potentially exculpatory evidence certainly is adequate protection for the defendant's constitutional rights under *Brady*.[21]

Second, the defendant's request is shortsighted. It assumes that only the prosecutor handling the trial will

[21] We recognize that defense counsel asked for an immediate in camera review of the journals for exculpatory material when their existence was disclosed at trial. The trial court's response was that the state had the obligation to review the journals for exculpatory information. The defendant did not claim before the trial court that the court incorrectly determined that review of the journals for *Brady* material was for the prosecutor in the first instance, he makes no such claim on appeal, and defense counsel did not renew his request for an in camera review after the prosecutor reported that the journals contained no exculpatory materials, with the possible exception of the short excerpt.

We further note that the defendant requests on appeal that, "if this court agrees that the prosecutors had the constitutional obligation to personally review the journals," and, "if further review of the journals is deemed necessary [to determine whether the trial court's failure to order the prosecutors to do so was harmful error] . . . this court [either] conduct the *Brady* review or remand the case [and order] that [the] prosecutors personally conduct that review." The defendant does not seek any alternative form of relief if this court should reject his contention that a prosecutor is constitutionally prohibited from delegating review. Accordingly, because we conclude that the prosecutor did not violate *Brady* by not personally reviewing the journals, no further review is required. Thus, contrary to Justice D'Auria's suggestion in his concurring and dissenting opinion, there is no mystery as to the reason that we have not addressed his "practical" approach; the reason is that it was not raised on appeal.

The position of Justices Ecker and D'Auria, though billed as the "practical" approach by Justice D'Auria, essentially embarks down a path of review that has not been requested and is unwarranted. The cases cited by Justices Ecker and D'Auria to support the conclusion that a remand to the trial court for an in camera review is appropriate and necessary are inapposite. See *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 43, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987); *United States* v. *Stillwell*, 986 F.3d 196, 200–201 (2d Cir. 2021); *United States* v. *Djibo*, 730 Fed. Appx. 52, 55–56 (2d Cir. 2018); *United States* v. *Alvarez*, 358 F.3d 1194, 1209 (9th Cir.), cert. denied sub nom. *Valenzuela* v. *United States*, 543 U.S. 887, 125 S. Ct. 126, 160 L. Ed. 2d 148 (2004); *United States* v. *Rosario-Peralta*, 175 F.3d 48, 56–57 (1st Cir. 1999); *United States* v. *Griggs*, 713 F.2d 672, 674 (11th Cir. 1983); *United State*s v. *Dansker*, 537 F.2d 40, 65 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977), and cert. denied sub nom. *Valentine* v. *United States*, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977), and cert. denied sub nom. *Diaco* v. *United States*, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977); *State* v. *Pollitt*, 199 Conn. 399, 406–407, 415–16, 508 A.2d 1 (1986); *State* v. *Gonzales*, 186 Conn. 426, 435–36, 441 A.2d 852 (1982). Put simply, these cases are distinguishable because, in each of them, the defendant

349 Conn. 300 JUNE, 2024 335

State *v.* Andres C.

have the requisite familiarity with the trial proceedings and ignores the fact that very experienced individuals other than the trial attorney may possess that familiarity. For example, under the defendant's proposed rule, a highly experienced paralegal who has been trained in the requirements of *Brady* and who sat by the prosecutor's side during the entire trial, or a supervising prosecuting attorney who had been supplied with the transcript of the proceedings, could not conduct a *Brady* review. Moreover, a rule that required the trial prosecutor personally to conduct a *Brady* review might result in extraordinary delays in the trial, depending on the volume of records to be reviewed.

claimed on appeal either that the government had refused the defendant's request to review specific evidence for *Brady* material, or that the defendant became aware of undisclosed evidence that was subject to disclosure under *Brady* during or after trial. This is not the case here.

For the same reason, Justice D'Auria's reliance on this court's decision in *State* v. *Floyd*, supra, 253 Conn. 732, as support for his suggestion that we remand the case to the trial court to order the translation of the journals and for further fact-finding is misplaced. See part IV of the concurring and dissenting opinion. *Floyd* involved the discovery of potential *Brady* material posttrial, while the defendant's appeal was pending. See *State* v. *Floyd*, supra, 730. Subsequent to *Floyd*, this court has made clear that "[w]e will order a *Floyd* hearing to develop a potential *Brady* violation only in the unusual situation in which a defendant was precluded from perfecting the record due to new information obtained after judgment." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006).

As we explained, in the present case, the trial court ordered the state to review the journals for *Brady* material, and that review occurred with the full knowledge of the defendant as to exactly how that review was going to take place; there was no refusal to review the journals. Following the review, there was no request for additional relief that the trial court denied. And the defendant has not identified on appeal any evidence that was subject to *Brady* that the state failed to disclose. The defendant's only claim on appeal is that the prosecutor herself was required to conduct the review. Notwithstanding the insistence to the contrary by Justices D'Auria and Ecker, the defendant does not seek—and the state does not acquiesce in— any additional form of relief should we reject this nondelegation claim. To the extent that Justices D'Auria and Ecker rely on the defendant's contention that, if this court were to agree with his nondelegation claim (which we do not), a *Brady* violation must exist because the nondisclosed portions of the journals necessarily contain impeaching or exculpatory information, we disagree with that contention. See footnote 14 of this opinion.

State *v.* Andres C.

Third, courts may adopt constitutional prophylactic rules only when "the risk of a constitutional violation is sufficiently great that simple case-by-case enforcement of the core right is insufficient to secure that right . . . ." (Footnotes omitted; internal quotation marks omitted.) C. Rogers, supra, 98 B.U. L. Rev. 547. Case-by-case enforcement is inadequate only when constitutional protections are "not by their terms readily applicable in the field"; (internal quotation marks omitted) id., 553; or when there is an absence of "judicially manageable standards." Id., 554. In the present case, the defendant has pointed to no evidence that prosecutors or courts are experiencing difficulty in determining in particular cases whether a person is qualified to conduct a *Brady* review. But cf. id. (before United States Supreme Court's adoption of prophylactic rule in *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), "[c]ourts had struggled to determine whether confessions were voluntary or whether, instead, a defendant's will was overborne" (internal quotation marks omitted)). Thus, there is no reason to believe that case-by-case enforcement is inadequate. If a defendant challenges the qualifications of the person who conducted the *Brady* review, and the trial court finds that the person was unqualified, it can order review by a qualified person. See, e.g., *Batarfi* v. *Bush*, 602 F. Supp. 2d 118, 120 (D.D.C. 2009) (instructing government that "[a]ny delegation of a review for exculpatory evidence to attorneys who do not understand or are not familiar with *Brady* and its progeny . . . is absolutely unacceptable and will not be tolerated"). Courts also have the authority to dismiss the charges in egregious cases[22] or to refer the prosecutor for disciplinary proceedings.[23]

[22] See, e.g., *Virgin Islands* v. *Fahie*, 419 F.3d 249, 254–55 (3d Cir. 2005) ("dismissal for a *Brady* violation may be appropriate in cases of deliberate misconduct because those cases call for penalties [that] are not only corrective but are also highly deterrent").

[23] A prosecutor who fails to comply with his or her ethical obligation to disclose exculpatory and mitigating evidence to the defendant may be

State *v.* Andres C.

Although the defendant in the present case argues, in support of his proposed prophylactic rule, that, on the basis of the record, this court cannot have "confidence that the investigator [who conducted the *Brady* review] was properly instructed about *Brady*'s requirements," he has not expressly raised a freestanding claim that, even if this court should reject his request for a prophylactic rule categorically barring the prosecutor from delegating *to anyone Brady* review of records that come to light during trial, we should find that this particular delegation was improper. The defendant's decision not to raise this claim on appeal is probably for good reason: he did not raise the issue of the adequacy of the investigator's legal training in the trial court, and, therefore, there are no factual findings concerning the issue. There also are no factual findings as to whether the investigator had sufficient knowledge of the facts of this case and the nature of the complainant's testimony to conduct a *Brady* review. Thus, if the defendant had made that unpreserved claim on appeal, the record would be inadequate for review of those issues. Unlike Justice Ecker, we decline to draw negative conclusions regarding the investigator's background from an incomplete and inadequate record.[24]

referred to professional disciplinary proceedings and subject to sanctions. See *In re Kurtzrock*, 192 App. Div. 3d 197, 209, 213–15, 221, 138 N.Y.S.3d 649 (2020) (granting motion to confirm prosecutor's suspension from practice of law for two years after he removed favorable materials from disclosed files and neglected, in several instances, to make any effort to comply with rule of professional conduct requiring him to disclose to defendant all information known to prosecutor "that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence"); see also Rules of Professional Conduct 3.8 (4) (prosecutor shall "[m]ake timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense"); *Kyles* v. *Whitley*, supra, 514 U.S. 437 (*Brady* "requires less of the prosecution than the [American Bar Association] Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate").

[24] Justice Ecker would have us misapply *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), by addressing a claim that the defendant has not

State *v.* Andres C.

Although we reject the defendant's request for a constitutional prophylactic rule requiring prosecutors to personally review evidence that comes to light during trial for *Brady* material, we recognize that, when a prosecutor obtains assistance from another person for purposes of reviewing material for potential *Brady* information, and that person fails to identify information that is, in fact, subject to *Brady*, it is possible that that information may *never* come to light. Accordingly, we pause here to reiterate and emphasize "the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 571–72, 849 A.2d 626 (2004); see, e.g., Rules of Professional Conduct 3.8, commentary ("[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate"). As the United States Court of Appeals for the Ninth Circuit stated in

raised on appeal, namely, that, even if the prosecutor was not constitutionally required to personally review the journals, this particular investigator was unqualified to do so. See part II of the dissenting opinion. Even if the defendant had raised that claim, the record would be inadequate for review under the first prong of *Golding*. See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 53, 58, 63–64, 901 A.2d 1 (2006) (under first prong of *Golding*, record was inadequate to review defendant's claim that consent of both present joint occupants of premises is necessary for search when issue of one occupant's consent was not before trial court, and, therefore, facts relevant to that occupant's consent were not adduced), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Because the defendant has not raised that claim on appeal, we need not consider whether we should adopt an exception to the *Golding* requirement of an adequate record for review in cases in which the defendant has failed to claim before the trial court that the person who conducted the *Brady* review was unqualified to do so and remand such cases to the trial court for further factual findings on the issue. But cf. *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006) ("[w]e will order a *Floyd* hearing to develop a potential *Brady* violation only in the unusual situation in which a defendant was precluded from perfecting the record due to new information obtained after judgment" (internal quotation marks omitted)).

State *v.* Andres C.

*United States* v. *Alvarez*, 86 F.3d 901 (9th Cir. 1996), cert. denied, 519 U.S. 1082, 117 S. Ct. 748, 136 L. Ed. 2d 686 (1997), ''[b]ecause the government's failure to turn over exculpatory information in its possession is unlikely to be discovered and thus largely unreviewable, it is particularly important for the prosecutor to ensure that a careful and proper *Brady* review is done. Delegating the responsibility to a nonattorney police investigator to review his own and other officers' rough notes to determine whether they contain *Brady* . . . information is clearly problematic. Although we have held that the [trial] court cannot order [a prosecutor] personally to review law enforcement personnel files . . . we see little justification and much danger to both the prosecutor's reputation and the quality of justice her office serves for a prosecutor not to review personally those materials directly related to the investigation and prosecution of the defendants, such as a testifying officer's surveillance notes.'' (Citations omitted.) Id., 905.

Indeed, it is the obligation of the prosecutor, not the defendant or the courts, to ensure, in the first instance, that the principles of justice that underlie *Brady* are fully served. See, e.g., *United States* v. *Jennings*, supra, 960 F.2d 1490 (prosecutor ''is responsible for compliance with the dictates of *Brady* and its progeny''); *United States* v. *Cadet*, 727 F.2d 1453, 1467 (9th Cir. 1984) (''[t]he prosecutor's oath of office, not the command of a federal court, should have compelled the government to produce any favorable evidence in the personnel records''). We therefore believe that, regardless of when the state becomes aware of potentially exculpatory information or how the information comes to light, it is the better practice for prosecutors personally to review the information, or at least to seek assistance from attorneys, or other qualified staff members, who have received comprehensive training in the requirements of *Brady* and who are sufficiently knowledgeable about the case, including possible defenses, to appreciate the import of the information under review.

State *v.* Andres C.

We emphasize that the review for *Brady* material is quintessentially a prosecutor's role, and the prosecutor bears ultimate responsibility for compliance with *Brady.* See, e.g., General Statutes § 54-86c (a) ("the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor"); accord Practice Book § 40-11 (b). For example, the United States Department of Justice policies and procedures provide that "prosecutors must ensure that the material is reviewed to identify discoverable [*Brady*] information. It would be preferable if prosecutors could review the information themselves in every case, but such review is not always feasible or necessary. *The prosecutor is ultimately responsible for compliance with discovery obligations. . . .* Because the responsibility for compliance with discovery obligations rests with the prosecutor, the prosecutor's decision about how to conduct this review is controlling. This process may involve agents, paralegals, agency counsel, and computerized searches. Although prosecutors may delegate the process and set forth criteria for identifying potentially discoverable information, *prosecutors should not delegate the disclosure determination itself.*" (Emphasis altered.) U.S. Dept. of Justice, Justice Manual, tit. 9, 9-5.002 (Step 2), available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.002 (last visited June 11, 2024).

Similarly, the Connecticut Division of Criminal Justice recognizes the central role the prosecutor plays in the *Brady* process: "The prosecutor is deemed to possess all favorable evidence, and is deemed to know if any member of the prosecution team possesses favorable evidence, even if the prosecutor does not have actual possession or knowledge of that favorable evidence." Office of the Chief State's

State *v.* Andres C.

Attorney, Connecticut Division of Criminal Justice Policies and Procedures (July, 2022) Policy 512a (Policy Regarding Disclosure of Exculpatory & Impeachment Evidence), p. 2. We have recognized as much. See *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988) (collective knowledge of entire prosecution team imputed to prosecutor).

With respect to voluminous discovery material, in order to avoid an inadvertent failure to disclose *Brady* material, "prosecutors may discharge their disclosure obligations by choosing to make the voluminous information available to the defense." U.S. Dept. of Justice, supra, 9-5.002 (Step 1); see id. (Step 3) ("[p]rosecutors are encouraged to provide broad and early discovery consistent with any countervailing considerations"); see also id. (Step 2) ("[i]n cases involving voluminous evidence obtained from third parties, prosecutors should consider providing defense access to the voluminous documents to avoid the possibility that a well-intentioned review process nonetheless fails to identify material discoverable evidence"). In sum, a prosecutor may seek assistance in reviewing discovery for potential *Brady* material from someone with competency and an understanding of the full scope of the prosecutor's responsibility under *Brady*. That individual also must have an understanding of the specific details of the case. The prosecutor himself, however, remains constitutionally, professionally and ethically accountable for that individual's performance.

As we explained, the defendant has not expressly raised a freestanding claim that the particular delegation of *Brady* review in this case was improper because the investigator was not adequately trained to conduct a review for *Brady* material or was not sufficiently familiar with the facts of the case. Indeed, when the prosecutor informed the trial court that a Spanish-speaking investigator would conduct the review, the defendant and his counsel did not object to this approach and agreed that a translation was not

State *v.* Andres C.

necessary.[25] See footnotes 4 and 21 of this opinion. Because prosecutors have no constitutional obligation personally to conduct a review for *Brady* material that comes to light during trial, we conclude that the Appellate Court correctly determined that the prosecutor was not constitutionally required to personally review the complainant's journals for *Brady* material.[26]

Justice Ecker concludes in his dissent that, to the contrary, "the investigator's review of the complainant's journals for *Brady* material was not constitutionally adequate, and, therefore, the journals were suppressed . . . within the meaning of *Brady*." Part II of the dissenting opinion. To the extent that Justice Ecker concludes that the particular investigator who conducted the *Brady* review did not possess the legal training and knowledge required to conduct a *Brady* review and was unqualified to translate the jour-

[25] In any event, the focus of Justices D'Auria and Ecker on obtaining a translation misses the point. In fact, the defendant barely mentions the lack of a translation in his briefs to this court, which is not surprising given his and defense counsel's agreement in the trial court that a translation was not necessary. In the end, it is not the translation that is at the crux of the question here but, rather, the review for *Brady* material. We *have rejected* the defendant's claim that a prosecutor cannot ask a qualified individual to conduct a *Brady* review of evidence that comes to light during trial. Thus, delegation is not constitutionally prohibited regardless of whether the records are in English, and translation of the journals into English would not resolve our disagreement with Justices D'Auria and Ecker over who is required to review them.

[26] Justice Ecker would go much farther and, relying on *Kyles* v. *Whitley*, supra, 514 U.S. 437–48, concludes that the individual prosecuting attorney or a trained attorney on the prosecution team has an obligation, not just to disclose exculpatory evidence, but also to personally review at least certain evidence to fulfill the disclosure obligation. See part II of the dissenting opinion. The problem is that the United States Supreme Court nowhere in *Kyles* sets forth such a review requirement. Rather, the statements from *Kyles* relied on by Justice Ecker were made in response to the argument that a prosecutor is not responsible for disclosing exculpatory or impeachment material in the hands of the police that the prosecutor does not know about. See *Kyles* v. *Whitley*, supra, 438. The Supreme Court in *Kyles* confirmed that the prosecutor is responsible under *Brady* for any failure to disclose exculpatory evidence to the defense, even if the police have not revealed the evidence to the prosecutor. See id., 437–38. The ultimate responsibility for disclosure rests with the prosecutor. See id.

349 Conn. 300 JUNE, 2024 343

State *v.* Andres C.

nals, as we already explained, the defendant has not raised any such claim on appeal. The defendant also did not raise any such claim before the trial court, and, consequently, there are no factual findings concerning this issue.[27] It is

[27] Justice Ecker asserts that, when the prosecutor gave four pages of the journals to the trial court for an in camera review, she represented to the trial court that they did not contain *Brady* material "but, instead, were subject to in camera review under . . . § 54-86f (a) [the rape shield statute] because they involved evidence of the complainant's sexual conduct." Footnote 21 of the dissenting opinion. Justice Ecker contends that "one of those pages contained *Brady* material that went unrecognized and unacknowledged by the prosecutors," and this fact "demonstrates conclusively" that the prosecutor herself was unable to recognize *Brady* material. Id. In turn, Justice Ecker contends, this "casts doubt on the propriety of delegating that responsibility to a nonlawyer instructed by the prosecutors . . . ." Id. We disagree.

It is true that, before disclosing the four pages to the trial court for review, the prosecutor stated that the material was not exculpatory and that defense counsel was not entitled to cross-examine the complainant on that material, which involved an account of prior sexual conduct that the complainant later testified was counterfactual, because the four pages were protected by § 54-86f, the rape shield statute.

We acknowledge that the prosecutor's statement that the excerpts from the journals were not subject to *Brady* is somewhat confounding. The rape shield statute created no obligation for the prosecutor to disclose evidence of the complainant's sexual conduct to the defendant. Rather, the statute provides that evidence of the complainant's sexual conduct is inadmissible unless that evidence is subject to one of the statutory exceptions. For purposes of this case, the relevant exceptions are set forth in subdivision (2) of § 54-86f (a), which provides that such information is admissible on the issue of a complainant's credibility if the complainant has testified on direct examination as to his or her sexual conduct, and in subdivision (4) of § 54-86f (a), which provides that the information is admissible if it is "so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights." We have recognized that subdivision (4) contemplates a *Brady* review. See *Demers* v. *State*, supra, 209 Conn. 160 (evidence that is subject to *Brady* is subject to exception set forth in what is now § 54-86f (a) (4)).

Whatever the prosecutor's reason may have been for providing the excerpts to the trial court, it is clear that the court understood that it was reviewing them for *Brady* material. After the prosecutor provided the excerpts to the trial court, although the court initially stated that "the state [is] not ask[ing] [it] to review [the excerpts] for *Brady* material" but was requesting review pursuant to the rape shield statute, the court then immediately observed that "the [rape shield] statute authorizes the [prosecutor] to ask a judge to review [evidence subject to the statute for] potential *Brady* material to determine whether it was in fact exculpatory and should be turned over to the defendant," and asked the parties whether it should refer the matter to another judge to make that determination. Shortly thereafter, the trial court again observed that, under the rape shield statute, "certain

344 JUNE, 2024 349 Conn. 300

State *v.* Andres C.

axiomatic that appellate courts cannot find facts in the first instance. See, e.g., *Gianetti* v. *Norwalk Hospital*, 266 Conn. 544, 560, 833 A.2d 891 (2003). Thus, the record is inadequate for review. Indeed, had the state known that the investigator's qualifications would be subject to scrutiny on appeal, it might have sought to present additional ones.

To the extent that Justice Ecker suggests that *no one* but the prosecutor constitutionally could perform the *Brady* review under the circumstances present here, for the reasons set forth previously, we cannot agree. Justice Ecker cites numerous authorities for the propositions that the ultimate responsibility for complying with *Brady* rests with the prosecutor and that compliance with *Brady* requires specialized legal training and the exercise of judgment— propositions with which we have no quarrel. But neither Justice Ecker nor the defendant has cited, and our research has not revealed, a single case in which a court has concluded that the government violated *Brady* merely because the records at issue were not personally reviewed by the prosecutor.[28] No such prophylactic rule is necessary

material . . . should be turned over to the defendant," and asked the parties a second time whether they objected to the court's reviewing the excerpts for such material. The parties agreed that the trial court could conduct the review. We further note that the trial court earlier explained to the state its obligation by stating that, "if there's anything that the state is uncertain as to whether it's exculpatory, [it] can provide those portions of the journals to [the court], and [it] will review them in camera to determine whether they should be disclosed to defense counsel."

Thus, although the prosecutor's statement that the four pages contained no *Brady* material was not correct, because the trial court conducted the *Brady* review after the prosecutor asked the trial court to conduct an in camera review, and the defendant received the information to which he was constitutionally entitled, we decline to draw the inference that other aspects of the *Brady* review were inadequate. Furthermore, even if the prosecutor may have made a mistake in her *Brady* analysis as to one document, that would not demonstrate conclusively that she did not understand her obligations under *Brady*. Finally, we again note that the defendant, after learning that there was at least one page of exculpatory material in the journals, never asked the court to conduct a further in camera review of the journals for additional *Brady* material.

[28] Contrary to Justice Ecker's contention that the review here resulted in suppression; see footnote 25 of the dissenting opinion; as the state points out, the defendant does not claim that the state "suppressed" favorable information in violation of *Brady*, which is ordinarily an element of a *Brady*

349 Conn. 300 JUNE, 2024 345

State *v.* Andres C.

because a case-by-case review and the available judicial standards adequately protect a defendant's constitutional rights. To be sure, the defendant was free to challenge the qualifications of the investigator to conduct the *Brady* review at trial or to ask the trial court for an in camera review *after* the prosecutor indicated that, with the exception of the short excerpt, the journals contained no *Brady* material. We therefore decline to adopt a gratuitous *Brady* requirement that no other court has recognized simply as a hook on which to hang relief that would not have been necessary if the defense had taken advantage of adequate existing procedures.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and McDONALD, DANNEHY and BRIGHT, Js., concurred.

McDONALD, J., concurring. "Criminal discovery is not a game. It is integral to the quest for truth and the fair adjudication of guilt or innocence." *Taylor* v. *Illinois*, 484 U.S. 400, 419, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (Brennan, J., dissenting). All too often, when it comes to discovery obligations, parties improperly shift their focus from an orderly quest for truth and allow the discovery process to devolve into "an adversary game." (Internal quotation marks omitted.) *State* v. *Morales*, 232 Conn. 707, 723, 657 A.2d 585 (1995). The law, however, does not avert its focus from the quest for truth. It is for this reason that our law provides fulsome discovery procedures for material information relevant to the defense of a criminal defendant. Our

claim; see, e.g., *State* v. *Floyd*, supra, 253 Conn. 736; but claims only that the procedure that the state used to review the journals was constitutionally inadequate. Although the state is correct, we underscore that, in order to ensure a meaningful review for exculpatory material, *Brady* requires that the person conducting the review be knowledgeable about "the meaning of exculpatory evidence and the principles set forth in *Brady* . . . ." (Citation omitted.) *Batarfi* v. *Bush*, supra, 602 F. Supp. 2d 119–20; as well as the facts of the case being prosecuted.

State *v.* Andres C.

criminal justice system is at its best when the court and the parties to a criminal prosecution are mindful of the truth seeking function of the discovery process and, through it, a criminal trial.

Although I join the majority opinion, I write separately to emphasize the proper scope of criminal discovery and because I believe that the complainant's journals, in which she had written about her relationship with the defendant, Andres C., and his sexual abuse of her, were most likely discoverable pursuant to Practice Book § 40-11. Nevertheless, because the defendant did not rely on § 40-11 before the trial court, or assert that argument before either the Appellate Court or this court, this cannot serve as a basis to reverse the judgment of the Appellate Court.

The complainant and the defendant, the complainant's uncle, lived with the complainant's grandmother. *State* v. *Andres C.*, 208 Conn. App. 825, 828, 266 A.3d 888 (2021). During the period that the complainant and the defendant were living at the grandmother's house, there were numerous incidents of sexual abuse. Id., 828–29. This continued after the complainant moved out of her grandmother's house. Id., 829. When she was sixteen years old, the complainant began seeing a therapist, and she disclosed the sexual abuse by the defendant. Id. The defendant was ultimately charged with sexual assault in the third and fourth degrees and risk of injury to a child. Id.

On the first day of trial, during the state's redirect examination of the complainant, one of the prosecutors inquired whether the complainant had ever seen her therapy records. Id., 844–45. The complainant responded: "I have my journals. . . . I don't have—I don't know [the therapist's] records, but I have my journals."[1] Upon

_____

[1] It appears that neither the prosecutors nor defense counsel had previously been aware of these journals.

State *v.* Andres C.

further inquiry, the complainant stated: "For the journals, [the therapist] would have me write a lot about either my relationship to [the defendant], with [the defendant], how the abuse happened. I would reflect a lot on how it made me feel, how I was missing, why I didn't want to talk. Sometimes in the journal we'd write about—like if I was having family fights, so my journals are the abuse that I lived with him, but also family fights with my siblings and my mom." The complainant "also stated that the journals were her words through therapy . . . ."

On recross-examination, defense counsel asked the complainant whether she had reviewed her journals prior to testifying. The complainant "responded that she had looked at a 'few pages' in one of her journals." *State* v. *Andres C.*, supra, 208 Conn. App. 845. The complainant clarified that the journals were written while she was in therapy and that they were the best record of what happened. Id., 845–46.

Defense counsel then requested an in camera review of the complainant's journals. Id., 846. Defense counsel also suggested that the trial court review the journals for exculpatory material. Id. "The court responded that the obligation to review the journals for exculpatory material rested with the prosecutors and that, if there was a claim of privilege, it would conduct an in camera review. Defense counsel responded: 'I am asking for it as discovery; however, I was trying to be as respectful as I could be to the complainant.' The court then suggested a further discussion of this issue in chambers and mentioned the possibility of recalling the [complainant] as a witness, if necessary." Id.

The following day, the trial court summarized the discussions that had occurred in chambers. Id. The court explained that the journals should be reviewed by the state to determine if anything in the journals,

totaling approximately 200 pages, comprises statements by the complainant concerning the incidents in question and whether there was any exculpatory material. Id. The court instructed the prosecutors to turn over any material concerning the sexual assault allegations and any exculpatory material. Id., 846–47. The court also noted that, because the journals were written in Spanish, the prosecutors needed the assistance of someone on their staff to interpret the journals. Id., 847. Both the prosecutors and defense counsel agreed, and neither raised any objection to proceeding in that manner. Id.

The next day, the trial court placed the following order on the record: "It is my order that the state review those journals to determine if there is any exculpatory information with respect to those journals that need[s] to be disclosed to the defendant, and that includes any inconsistent statements and any statements regarding the therapy method used that may have fostered or . . . instructed [the complainant] to use her imagination or [to] speculate or embellish as to what happened, but, basically, the . . . state needs to review those journals under its *Brady* obligations[2] and . . . [to] turn over to the defendant anything that is exculpatory." (Footnote added; internal quotation marks omitted.) Id. After the state completed its review, the prosecutors submitted four pages from the journals for review by the trial court. Id., 848–49. The trial court "determined that one page should be disclosed to the defense." Id., 849.

The issue addressed in part I of the majority opinion is whether the defendant was entitled to a copy of the complainant's journals. The defendant contended before the Appellate Court; id., 851; and now contends before this court, that he was entitled to disclosure of

[2] See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

State *v.* Andres C.

the journals under Practice Book §§ 40-13A and 40-15 (1). Although not argued by the defendant, I write separately because I believe that the journals were most likely discoverable under Practice Book § 40-11 and to note that nothing in the majority opinion should be read to preclude such a disclosure under that provision.

I begin with the well settled principle that "our constitution imposes certain obligations on the state to ensure that the criminal trial is a search for truth, not an adversary game." (Internal quotation marks omitted.) *State* v. *Morales*, supra, 232 Conn. 723; see also, e.g., *State* v. *Artis*, 314 Conn. 131, 155, 101 A.3d 915 (2014). This is because "[t]he ends of justice will best be served by a system . . . [that] gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial." (Internal quotation marks omitted.) *State* v. *Bronson*, 258 Conn. 42, 54, 779 A.2d 95 (2001). As a result, "[t]he purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportunity to prepare for trial." (Internal quotation marks omitted.) *State* v. *Tutson*, 278 Conn. 715, 744–45, 899 A.2d 598 (2006). It is to this end that "our law . . . provides liberal discovery procedures for criminal defendants, both as a matter of right . . . and as matters for the discretion of the [trial] court . . . ." (Internal quotation marks omitted.) *State* v. *Malave*, 250 Conn. 722, 732, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). Indeed, the Division of Criminal Justice admirably acknowledges that "providing a defendant with discovery is one of the ways that the state ensures a just result in every case and protects the defendant's constitutional right to a fair trial." Office of the Chief State's Attorney, Connecticut Division of Criminal Justice Policies and Procedures (October 6, 2023) Policy 512 (Discovery), p. 1. The division also advises prosecutors that,

State *v.* Andres C.

"[i]n many cases, prosecutors may maintain an 'open file' policy allowing the defense to have access to the case file. An 'open file' policy is often beneficial and can advance the interests of justice, but prosecutors cannot rely on such a policy to satisfy their disclosure obligations." Id., p. 8.

With this background in mind, I turn to Practice Book § 40-11 (a), which provides in relevant part: "Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of, provide photocopies of, and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on . . . (1) [*a*]*ny books, tangible objects, papers, photographs, or documents within the possession, custody or control of any governmental agency*, which the prosecuting authority intends to offer in evidence in chief at trial or *which are material to the preparation of the defense* or which were obtained from or purportedly belong to the defendant . . . ." (Emphasis added.)

In short, if a defendant files a written request for discovery under Practice Book § 40-11, the state is required to turn over any books, tangible objects, papers, photographs, and documents within the state's possession if (1) the state intends to offer the items into evidence, (2) the items are material to the preparation of the defense, or (3) the items were obtained from, or belong to, the defendant. Once such a request is made in writing, the state has a continuing obligation to disclose such materials to the defendant. See Practice Book § 40-3 ("[i]f prior to or during trial a party discovers additional material previously ordered to be disclosed

349 Conn. 300 JUNE, 2024 351

State *v.* Andres C.

or which the party is otherwise obligated to disclose, such party shall promptly notify the other party and the judicial authority of its existence'').

The second circumstance in which a defendant is entitled to discovery—when it is material to the preparation of the defense—is a significant provision of our rules of criminal procedure that may provide critical evidence that a defendant may not be able to obtain otherwise. This language is critical to effectuating the goal of robust discovery of material information in the possession of the state to ensure that the criminal trial is a search for the truth. The history of Practice Book § 40-11 confirms that fact and reveals that the phrase "material to the preparation of the defense" in § 40-11 (a) (1) was intentionally included in order to broaden the scope of our rules of discovery with respect to information that must be furnished by the state to a criminal defendant.

In or around 1976, the Rules Committee of the Superior Court, with the approval of the Chief Justice and the Chief Court Administrator, created the Advisory Committee to Revise the Criminal Rules, the members of which were recommended by the chief judges of the Superior Court and the Court of Common Pleas, the chief state's attorney, the chief public defender and the president of the Connecticut Bar Association. See Connecticut Judicial Dept., Foreword to Proposed Rules of Criminal Procedure (Final Draft January, 1976) p. iii. The selected membership was comprised of a preeminent group of prosecutors, public defenders, private practitioners, and judges, and was chaired by Judge (later Justice) David M. Shea. The Advisory Committee was tasked with undertaking a comprehensive revision and consolidation of the rules of criminal procedure. See id. Relevant to this case, the Advisory Committee's final draft of proposed rule 19 provided that, upon written motion made by a defendant, the prosecuting authority

State *v.* Andres C.

shall disclose "[a]dequately identified books, tangible objects, papers, photographs, or documents which are within the possession, custody, or control of any state agency, and which are *material to the preparation of his defense* or are intended for use by the prosecuting authority, as evidence in chief at trial . . . ." (Emphasis added.) Connecticut Judicial Dept., Proposed Rules of Criminal Procedure (Final Draft January, 1976) p. 40 (proposed criminal procedure rule 19 (a) (3)). The editor's note to proposed rule 19 (a) provides that the provision "enlarges the items discoverable by the defendant as of right." Id., p. 41 (editor's note to proposed rule 19 (a)); see also L. Orland, Connecticut Criminal Procedure (1976) p. 102 (commentary to Practice Book (1963) § 2152 (effective October 1, 1976)) (this section is "[a] broad provision, an expansion of existing practice, [that] enumerates items [that] are discoverable as of right" (footnote omitted)). Proposed rule 19 was adopted by the judges of the Superior Court, as drafted, in 1976 as § 2152. See Practice Book (1963) § 2152 (3) (effective October 1, 1976).

In 1981, § 2152 was renumbered § 741 but remained substantively unchanged. In 1994, however, the Criminal Division Task Force recommended to the Rules Committee that it remove subdivision (3) of § 741, which included the "material to the preparation of the defense" language.[3] Criminal Division Task Force, Superior Court Criminal Rules (Final Draft June 14, 1994) § 741, p. 66. During the public hearing on the proposed changes to § 741, however, Chief Public Defender Gerard A. Smyth emphasized the policy behind the discovery

_____

[3] The task force comment to § 741 provides that the "proposal is patterned after [N.Y. Crim. Proc. Law § 240.20 (repealed January 1, 2020)], and suggests a concept of limited discovery on demand rather than on court order." Criminal Division Task Force, Superior Court Criminal Rules (Final Draft June 14, 1994) p. 67. The task force did not offer any substantive reason or rationale as to why it sought to substantially scale back discovery that would be material to the preparation of a defense.

State *v.* Andres C.

rules, stating: "*If the public policy behind the proposed changes to the discovery rules is to make the trial more of a search for truth*, as the commentary states, then I submit that disclosure of police reports prior to pretrial would be consistent with this policy." (Emphasis added.) Public Hearing on Proposed Superior Court Rules Before the Rules Committee of the Superior Court (June 5, 1995) p. 13 (Rules Committee Public Hearing). Significantly, the public defender for the judicial district of Stamford-Norwalk, Attorney Joseph G. Bruckmann, charitably noted that the task force, "perhaps through oversight, ha[d] eliminated the category of items material to the preparation of the defense" in § 741. Id., p. 19. He emphasized the importance of this language, explaining that he could "recall, in more than one case, significant pieces of evidence [he had] introduced at trial in support of the [defense's] theory of the case that were generated through the initial police investigation. For instance, crime scene photographs [that] were not obtained from the defendant, did not purportedly belong to him and were not introduced by the state." Id. Attorney Bruckmann concluded by stating: "If the desire in amending this provision is to enhance the search for truth, the Rules Committee proposal certainly, as worded now, does not further that objective and is, in fact, more restrictive than our present rule." Id.

The Rules Committee flatly rejected the task force's proposed deletion of the "material to the preparation of the defense" language and, instead, moved that language to subdivision (2) of § 741; see 57 Conn. L.J., No. 4, p. 44C (July 25, 1995); and the judges of the Superior Court agreed with the Rules Committee's recommendation to retain the language. Since that time, this provision was renumbered; see Practice Book § 40-11; but it has remained substantively unchanged.

It is evident that, throughout the history of Practice Book § 40-11 and its predecessor provisions, going back

State *v.* Andres C.

to 1975, the "material to the preparation of the defense" language was specifically contemplated and deemed necessary for inclusion by the Rules Committee and, through the committee, the judges of the Superior Court as a whole. As Attorney Bruckmann noted, there may be "significant pieces of evidence" that defense counsel may wish to enter into evidence in support of the defense's theory of the case that would otherwise be unobtainable because the prosecuting authority does not intend to offer the materials as evidence-in-chief and the items were not obtained from, and did not purportedly belong to, the defendant. Rules Committee Public Hearing, supra, p. 19. Therefore, in keeping with the history of § 40-11, which reflects that it is a "broad provision . . . [and] an expansion of existing practice"; L. Orland, supra, p. 102; I emphasize that nothing in the majority opinion precludes a defendant from seeking the discovery of items, such as the complainant's journals, pursuant to § 40-11 when they are material to the preparation of the defense.

In this case, there is no contention that the state intended to offer the journals into evidence or that the journals were obtained from, or belonged to, the defendant. Accordingly, under Practice Book § 40-11, the defendant most likely would have been entitled to the journals in the course of discovery because they were "material to the preparation of the defense . . . ." Practice Book § 40-11 (a) (1). There can be little doubt that the journals, which contained information about the complainant's relationship with the defendant and how the alleged abuse happened, would be material to the preparation of the defendant's defense. The complainant admitted that the journals, which were written closer to the time of abuse than the time of her testimony, were the best evidence of what had happened. Although the circumstances under which the state came into possession of the journals were certainly unusual,

State *v.* Andres C.

the state has a continuing obligation to disclose discoverable material to the defendant, even when it comes to light during trial. See Practice Book § 40-3.

The problem in this appeal, however, is clear. The defendant failed to raise a claim before this court or the Appellate Court regarding Practice Book § 40-11. Accordingly, § 40-11 cannot serve as a basis to reverse the judgment of the Appellate Court. Nothing in the logic of the majority opinion, in my view, would preclude the disclosure of such material in another case following a proper request for discovery under § 40-11 that requests such books, tangible objects, papers and documents from the state, as the journals would have been material to the preparation of the defense.

For the foregoing reasons, I respectfully concur.

D'AURIA, J., concurring in part and dissenting in part. When a court is presented with a case posing a unique set of facts amid a legal landscape that is not well developed, often, the most prudent course is to opt for a practical solution. This is such a case. And while I accept my share of responsibility for the delay in deciding this case, the most practical solution has always been right in front of us: remand the case to the trial court to order an official translation of the complainant's journals from Spanish to English. This simple step is appropriate under our rules of practice, is supported by our own case law and case law from other courts, and would resolve an unusual dilemma sooner than awaiting a collateral proceeding, serving the interests of the complainant, the parties, and the judicial system. I do not understand the majority's resistance to this commonsense solution, and I therefore respectfully dissent as to part II of the majority opinion. I concur with part I of the majority opinion except for footnote 10,

State *v.* Andres C.

with which I disagree and which, in my view, is not necessary to the opinion.

I

Prosecutors in the present case encountered a situation that challenged their conventional obligations to disclose to the defendant, Andres C., any exculpatory or impeachment evidence in their exclusive possession. See generally *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The complainant, the state's main witness, revealed for the first time during her redirect testimony that, at her therapist's suggestion, she had kept journals that documented some of the defendant's alleged abuse of her. That these journals promptly came into the state's possession, which the state does not dispute, meant it had a duty to review them to determine if they contained *Brady* material. See, e.g., *Strickler* v. *Greene*, 527 U.S. 263, 278, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (pursuant to *Brady*, state must "disclose to the defense all exculpatory evidence known to it—or in its possession" (internal quotation marks omitted)); *Peeler* v. *Commissioner of Correction*, 170 Conn. App. 654, 700, 155 A.3d 772 ("*Brady* requires the state to disclose all evidence in its exclusive possession that is favorable to the defendant and material. . . . *Brady* does not require the state to obtain and disclose evidence in the exclusive possession of a private, third party entity." (Citation omitted.)), cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017).

As prosecutors sought to comply with their affirmative constitutional obligation under *Brady*, at least two problems confronted them. First, although *Brady* claims most often involve either pretrial or posttrial skirmishes over potentially exculpatory evidence, these journals came to light during the complainant's testimony on the first day of trial. See *United States* v. *Agurs*, 427

349 Conn. 300 JUNE, 2024 357

State *v.* Andres C.

U.S. 97, 103–107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) (enumerating three circumstances in which *Brady* claims often arise, all occurring either before or after trial). Although the parties were trying the case to the court and not a jury, presumably, the court planned for the case to proceed apace. Second, the victim recorded her journals in Spanish, and the record does not reflect that any of the other participants in this trial spoke Spanish, or spoke it well enough to translate the journals in a way that would be useful to the state, the defendant, or the court.[1]

Both the majority and the dissent detail sufficiently the procedure trial prosecutors undertook to have the complainant's journals reviewed by an investigator in their office (reported to be bilingual), the limited disclosure made to defense counsel from the journals after that review, and the defendant's claim concerning those journals on which the parties are at issue on appeal. I will not repeat how that issue has arrived before us. The majority concludes that "the prosecutor did not violate *Brady* by not personally reviewing the journals" but, instead, delegating[2] that review to a subordinate.

[1] Another challenge to any review or use of the journals is that the complainant's testimony suggested both that her journals were the "best record" of her allegations of the defendant's abuse and also that, at her therapist's request, she sometimes used these journals for therapeutic exercises that were hypothetical in nature. Therefore, she did not claim that the journals were necessarily in all instances accurate accounts of the abuse. For example, she testified: "[My therapist] would have me write a lot about either my relationship to [the defendant], with [the defendant], how the abuse happened. I would reflect a lot on how it made me feel, how I was missing, why I didn't want to talk. Sometimes in the journal, we'd write about—like if I was having family fights, so my journals are the abuse that I lived with him, but also family fights with my siblings and my mom." The complainant also agreed with defense counsel when he asked her on cross-examination if the journals were her "words through therapy . . . ."

[2] The majority eschews use of the word "delegate." I do not understand its aversion to the word. I use the word "delegate" for two reasons. First, it is the word both the Appellate Court and the state use. Second, the euphemisms used to describe the prosecutors' assignment of the chore of translating the journals to the investigator fail because they are inaccurate.

State *v.* Andres C.

This conclusion leads the majority to reject the defendant's calls to adopt a prophylactic rule requiring prosecutors to personally review records that come to light during trial for *Brady* material and to hold that this fact bound determination of whether the prosecutors complied with *Brady* is to be determined on a case-by-case basis. The dissent would conclude, to the contrary, that "it is clear that the constitutional requirements of *Brady* have not been satisfied." The dissent would therefore remand the case to the trial court to have the journals translated into English and have the trial court review them in camera for *Brady* material.

My review of the authority contained in these competing opinions leaves me without confidence that there is a clear federal constitutional rule addressing this situation. Very little case law exists concerning the extent to which prosecutors may delegate the review of evidence as part of their affirmative constitutional duty under *Brady*. See *Kyles* v. *Whitley*, 514 U.S. 419, 432, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) ("[t]he prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early

---

Specifically, the prosecutors did not "enlist the assistance of a Spanish-speaking investigator on her staff to *help* review the journals." (Emphasis added.) Nor did the prosecutors enlist the investigator "to *assist in the review of records* for potential *Brady* material." (Emphasis added.) The investigator reviewed the journals. Period. The prosecutors did not. Indeed, on this record, as between the prosecutors and the investigator, the latter was the only one who *could* have reviewed them because they were written in Spanish. The majority's use of the passive voice does not help either. That is, the prosecutors did not "seek assistance" "when [the] material is reviewed to identify discoverable *Brady* information." These phrases connote that the prosecutors undertook some review of the journals, with the investigator assisting in that review. If, for whatever reason, we are to resist using the word "delegate," the more accurate description, supported by the record, is the use of a different preposition, namely, the investigator provided assistance to the prosecutors in meeting their *Brady* obligation *by* reviewing the journal. Use of this phrase would be unnecessarily confusing, however, because, although it is more accurate, I do not see how this is not the definition of "delegating" review of the journals.

State *v.* Andres C.

[twentieth] century strictures against misrepresenta-
tion and is of course most prominently associated with
this [c]ourt's decision in *Brady*'' (citation omitted)).
The case law that does exist does not, in my view,
sufficiently yield a federal rule.[3] In fact, if the defendant
had brought a claim of error based on the state constitu-
tion—and clearly he has not—I believe our case law
would require that we decide the state constitutional
question first. See, e.g., *State* v. *Kono*, 324 Conn. 80,
123, 152 A.3d 1 (2016) (''if the federal constitution does
not clearly and definitively resolve the issue in the
defendant's favor, we turn first to the state constitution
to ascertain whether its provisions entitle the defendant
to relief''). Although we certainly have the authority
and responsibility to rule on federal constitutional ques-
tions, in the present case, I would do so only after we
have exhausted any nonconstitutional basis for resolv-
ing the controversy before us. See, e.g., *State* v. *McCah-
ill*, 261 Conn. 492, 501, 811 A.2d 667 (2002) (we ''do not
engage in addressing constitutional questions unless
their resolution is unavoidable''). Fortunately, I believe
an obvious basis exists. Unfortunately, the majority
chooses not to pursue it.

II

The majority and the dissent, in their attempts to join
issue over what is at stake in this case, have not been

---

[3] Like the dissent, I believe that the majority overstates the significance
of the case law it relies on, citing no federal cases above the federal court
of appeals level and no cases outside of the personnel files context. See
*United States* v. *Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992); *United States*
v. *Smith*, 552 F.2d 257, 262 (8th Cir. 1977); *Stacy* v. *State*, 500 P.3d 1023,
1038 (Alaska App. 2021). This case law is sufficiently sparse and distinguish-
able that I would not glean from it a clear federal rule that courts should
review a prosecutor's decision to delegate his or her *Brady* responsibility
only on a case-by-case basis. However, because my suggested resolution of
the present case does not require me to pass on the ''propriety of delegating
[*Brady* review] to a nonlawyer,'' I do not feel compelled to join in raising
all the concerns the dissent has raised about that delegation.

State *v.* Andres C.

able to agree on how to interpret the claim on appeal, including the relief the defendant seeks or the rule he advocates. The dissent concedes that the "defendant's request for a prophylactic rule may have been unnecessary" but concludes that this court has an "inherent authority and obligation" to consider remedies that are more tailored and narrow. Accordingly, the dissent reasons that the defendant's argument for the adoption of a prophylactic rule "does not preclude appellate review of his as applied *Brady* challenge." Responding to both this concurring and dissenting opinion and to the dissent, and notwithstanding that I have quoted verbatim three instances from the defendant's brief describing his position, the majority insists that "[t]he defendant's only claim on appeal is that the prosecutor herself was required to conduct the review."

But that's not accurate. The majority's strict reading of the defendant's claim leaves out a critical predicate to his proposed prophylactic rule before this court. Specifically, the defendant's "only claim on appeal" is *not* simply "that the prosecutor herself was required to conduct the review." Rather, the defendant argues that "due process require[s] that one or both of the prosecutors should have personally conducted a *posttranslation Brady* review." (Emphasis added; internal quotation marks omitted.) More particularly, the defendant explains that "the prosecutors, who elicited the complainant's direct and redirect testimony, and observed her cross-examination and recross-examination, were in the best position . . . to review the journals (*once translated*) for *Brady* material, and to make reliable 'judgment calls' about what should be disclosed." (Emphasis altered.) And, finally, the defendant argues in his brief: "Reviewing 200 pages of a witness' journal (*once translated*) may seem like a burden or inconvenience to a prosecutor, but when specific materials must be subjected to a *Brady* review, any burdens

State *v.* Andres C.

associated with that duty become irrelevant.'' (Emphasis added.) The defendant made the same request before the Appellate Court. To the extent the majority contends that ''the defendant has not identified on appeal any evidence that was subject to *Brady* that the state failed to disclose,'' it is impossible for the defendant to make such a claim *without* first obtaining a translation because the journal is in Spanish.

I agree with the dissent that ''[n]o principle of law or logic . . . precludes this court from granting more circumscribed relief'' than the defendant has requested. I would therefore address the defendant's argument on appeal to the extent that he seeks a rule that the state must secure an official translation, consistent with state judicial standards, of material that might contain exculpatory evidence, such as the complainant's journals. Juxtaposed against the lengths to which the majority goes to explain, and then ignores as irrelevant, the state's articulated position concerning the four pages it submitted to the trial court from the complainant's journal, the majority's position that the defendant has not sought any ''alternative form of relief'' in this court, such as ordering a remand for a translation of the journals, strikes me as overly stingy. About the journal excerpts, the majority explains, ''[w]hatever the prosecutor's reason may have been for providing the excerpts to the trial court, it is clear that the court understood that it was reviewing them for *Brady* material.'' As the dissent explains, its reason for raising the issue concerned the *prosecutors'* understanding of what they were submitting the excerpts to the court for (review under the rape shield statute), and not the *trial court's* understanding of what it found itself doing with those documents once they landed on its desk (review under *Brady* notwithstanding the prosecutors' specifically disclaiming an intent to submit for *Brady* review). The majority's reading of the record is supportable, although

State *v.* Andres C.

generous. I do not believe that it would require as much generosity for the majority to view the defendant's appeal as including a claim that we order preparation of an official translation for review by the fact finder for *Brady* material. That is to say, if we can divine what the trial court "understood" it should do with the journal excerpts, despite the state's "confounding" and in fact "mistake[n]" claim about those pages, surely, we can find our way to understanding that the defendant's claim seeks a translation. We should address that claim (and I would order it), even if we do not go so far as to agree with the defendant's claim that we should order the trial prosecutors to undertake a review of that translation personally.

In declining to adopt a prophylactic rule requiring prosecutors to review records personally for *Brady* material, with no ability to delegate responsibility to others, the majority insists that it perceives "no significant risk that, in the absence of such a prophylactic rule, the constitution will be violated." See, e.g., *State* v. *Dickson*, 322 Conn. 410, 426 n.11, 141 A.3d 810 (2016) (significant risk of constitutional violation justifies prophylactic rule), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). I am not prepared to conclude that federal law requires—either prophylactically or as applied to the present case—that, to fulfill their duties under *Brady*, trial prosecutors must review all records personally. However, I do not understand why the majority refuses to require—either prophylactically or as applied to this case—the translation of records that are in another language, like the complainant's journals, before prosecutors can represent to the trial court and the defendant that those records contain no *Brady* material. The majority does not explain why the risk of a constitutional violation is not "significant"—and was not in the present case—when prosecutors are *unable* to review the untranslated records

349 Conn. 300 JUNE, 2024 363

State *v.* Andres C.

personally for the simple reason that they do not speak the language in which the records are written. The Judicial Branch agrees that the risk of an inaccurate translation is genuine. Sensitive to the innumerable languages and dialects that may present themselves in court proceedings, the Judicial Branch has made interpreter and translation services available. As the dissent details, court-appointed translators for the Judicial Branch must pass written, oral, and ethics examinations, must agree to be bound by the Code of Professional Responsibility for Court Interpreters of the State of Connecticut Judicial Branch, and be sworn by a Superior Court judge. See Interpreter and Translator Services-CT Judicial Branch, available at https://jud.ct.gov/jobs/JobDetails.aspx?j=6329 (last visited June 11, 2024). In no way do I intend to disparage the state's investigator (who was performing an assigned task), or to ignore the midtrial challenge that prosecutors faced when I observe that we are equipped to do better than turning to someone who happens to be on staff and speaks Spanish to provide a translation. Nothing in the record indicates that the investigator's credentials qualified her to provide translation services to the court.[4]

_____

[4] Producing an accurate translation is often not an easy feat, as settling on the appropriate meaning for terms can require nuance. These difficulties presented themselves, for example, when defense counsel cross-examined the complainant about the one journal page that the defendant had received, with counsel and the witness stumbling over the Spanish words for "rewrite" versus "describe":

"[Defense Counsel]: And it's in Spanish; is that correct?

"[The Complainant]: Yes.

"[Defense Counsel]: And it says in Spanish, 'describir mi historia de abuso.' Have I read that correctly in Spanish?

"[The Complainant]: No.

"[Defense Counsel]: Could you read it, please?

"[The Complainant]: It says 'reescribir mi historia de abuso.'

"[Defense Counsel]: And what does that mean?

"[The Complainant]: 'Reescribir' means to rewrite . . . .

"[Defense Counsel]: And what does 'describir' mean?

"[The Complainant]: 'Describir?'

"[Defense Counsel]: Yeah.

"[The Complainant]: Well, 'describir' is to describe.

State *v.* Andres C.

The majority assures us several times—and admonishes the state—that prosecutors bear the "ultimate responsibility" of complying with the state's affirmative *Brady* obligations. But the majority does not explain how the prosecutors in the present case could have possibly carried out this ultimate responsibility when they could not read Spanish and no translation of the journals was provided for their review.[5] Without a trans-

* * *

"[The Court]: Can I just—well, it's not going to help me, it's in Spanish; so, go ahead. I mean, she—she interpreted it, so it's fine.

"[Defense Counsel]: Did you want to look at it, Your Honor?

"[The Court]: It's not going to help me. . . . Unless it says abogado or que pasa, it's not going to be much help.

"[Defense Counsel]: And we can agree that the Latin alphabet is the same alphabet in English as it is in Spanish, correct?

"[The Complainant]: Sure. I don't know that. Maybe.

"[Defense Counsel]: Well—

"[The Complainant]: Like, you mean the letters? A is A?

"[Defense Counsel]: Correct.

"[The Complainant]: Yeah.

"[Defense Counsel]: And that an R in Spanish looks like an R in English, correct?

"[The Complainant]: The R in Spanish looks like an R in English, yes.

"[Defense Counsel]: It's the same letter?

"[The Complainant]: Yes."

Not only is creating a baseline translation complex, but comprehending handwritten documents can create even more challenges in providing a correct translation. This was evident in the prosecutor's redirect examination of the complainant about the same journal page, as the prosecutor tried to determine whether the complainant wrote a certain word incorrectly in her journal entry:

"[The Prosecutor]: . . . [T]his page that you just saw, this was the prompt for which you wrote . . . .

"[The Complainant]: Yes, and it says 'rewrite,' because, if it said 'describe,' it would have less letters in that word. It's not just an accidental R and a D switch.

"[The Prosecutor]: So—

"[The Complainant]: It specifically says 'rewrite,' not 'describe.'

"[The Prosecutor]: Rewrite my history of abuse, correct?

"[The Complainant]: Yes, the way it should have played out."

[5] The majority cites to the United States Department of Justice Manual, which provides in relevant part: "Because the responsibility for compliance with discovery obligations rests with the prosecutor, the prosecutor's decision about how to conduct this review is controlling. This process may involve agents, paralegals, agency counsel, and computerized searches.

State *v.* Andres C.

lation, the prosecutors effectively relied entirely on the investigator's conclusions of what she recognized as *Brady* material, essentially delegating the state's final disclosure determination.

All that the majority can muster to say is that the record is inadequate to determine whether the state's delegation poses a constitutional problem, although, if prosecutors were to fall short of their *Brady* obligations, the state could suffer a disciplinary dismissal or the prosecutor could be vulnerable to a professional disciplinary complaint and proceeding.[6] Notwithstanding the prosecutors' "ultimate responsibility" for *Brady* compliance, under circumstances such as these, the possibility that the court might dismiss a prosecution or that trial prosecutors might be disciplined is so remote as to be facetious.[7] And appropriately so. Speak-

Although prosecutors may delegate the process and set forth criteria for identifying potentially discoverable information, prosecutors should not delegate the disclosure determination itself. . . .'' (Emphasis omitted.) U.S. Dept. of Justice, Justice Manual, tit. 9, 9-5.002 (Step 2), available at https:// www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5002 (last visited June 11, 2024).

In my view, this manual does not support the majority's position. This guidance draws a line when it comes to the final "disclosure determination itself,'' maintaining that this responsibility lies with the prosecutor alone. Id. To me, it seems quite clear that the prosecutors in this case *did* abandon the final *Brady* determination. Without a translation, the prosecutors had to fully rely on the investigator's representations, thereby functionally delegating the disclosure determination.

[6] Regarding a prosecutor's delegation to another person of the task of reviewing materials, such as journals, for compliance with *Brady*, the majority also states that the prosecutor "remains *constitutionally*, professionally and ethically accountable for that individual's performance.'' (Emphasis added.) I do not understand how a prosecutor is "constitutionally'' accountable under these circumstances. The majority just finished concluding that the prosecutors are not constitutionally accountable, despite the lack of translation and their delegation to the investigator.

[7] The majority can only be talking about the most egregious of *Brady* violations when the state might suffer a disciplinary dismissal or a prosecutor might be subject to professional discipline. Recent research reveals that, in 2000 instances of reported prosecutorial misconduct, "prosecutors were disciplined in only [44] cases and were never criminally prosecuted.'' (Emphasis omitted; internal quotation marks omitted.) B. Murray et al.,

State *v.* Andres C.

ing for myself, I would not support imposing sanctions on the state or on prosecutors for making judgments such as those they had to make midtrial in this case. I am not convinced that the law is so blind to the impossibility of the prosecutors' ultimate compliance with *Brady* in a case such as this, however. Even if we do not adopt a rule requiring that prosecutors review the documents personally for *Brady* material, I have not heard a convincing argument for why we would not at least rule that, under these circumstances, either as a prophylactic rule or in this case alone, the state was required to secure an official translation of the journals.

### III

Obtaining a translation of the journals that complies with Judicial Branch standards—even at this stage— is an uncontroversial and commonsense measure that could promptly resolve the issue of whether the journals contain additional exculpatory material while ensuring the protection of the defendant's constitutional rights.[8] Although the majority provides no overt explanation for its opposition to an official translation—either as a prophylactic rule, or as a solution in the present case, it hints at reasons for its resistance.

"Qualifying Prosecutorial Immunity Through *Brady* Claims," 107 Iowa L. Rev. 1107, 1122 n.85 (2022). Nor is potential personal liability a likely deterrent to noncompliance with *Brady* or an incentive for compliance. Prosecutors enjoy broad protections from harm for oversights or misjudgments in a particular case. See, e.g., *Imbler* v. *Pachtman*, 424 U.S. 409, 424–25, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976) (prosecutors have absolute immunity from actions brought pursuant to 42 U.S.C. § 1983 for all of their activities associated with their conduct during litigation because "[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages")).

[8] The trial court marked the journals as an exhibit so that "should an appellate court deem it appropriate to review those journals, they'll have an opportunity to do so." Surely, the judge anticipated that perhaps this court would not be able to review journals written in Spanish and acted under the assumption that we would have the journals translated if we were to review them.

State *v.* Andres C.

First, the majority points out that, after the prosecutor spelled out—in chambers and on the record—the procedure she intended to follow to review the journals for *Brady* material, defense counsel agreed on the record that a translation was not necessary. Although the majority describes the defendant as having "acquiesced in the procedure," it does not seriously contend—and develops no argument—that the defendant waived any claim that the state should have secured an official translation of the journals. Defense counsel only agreed with the trial court that the journals did not need to be translated "at this point," hardly a sufficiently unequivocal statement to constitute a waiver of this issue on appeal. This exchange occurred before prosecutors reported the results of the investigator's review to the court and before that report turned out to be lacking. Nor does the majority argue that the prosecution's affirmative obligation to disclose exculpatory information in its possession can be waived under these circumstances.[9] See, e.g., *Kyles* v. *Whitley*, supra, 514 U.S. 432–33; *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 189, 243 A.3d 1163 (2020) ("defendant cannot 'waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system' "), quoting *Sivak* v. *Hardison*, 658 F.3d 898, 909 (9th Cir. 2011).

The majority also points out that the defendant could have subpoenaed the complainant's journals or

[9] In the context of a defendant's attempt to withdraw his guilty plea, the United States Court of Appeals for the Second Circuit has held that a *Brady* claim will survive an otherwise knowing, intelligent, and voluntary guilty plea. See *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("[T]he validity of the plea must be reassessed if it resulted from impermissible conduct by state agents . . . . Impermissible conduct includes *Brady* violations. . . . Thus, we have noted that where prosecutors have withheld favorable material evidence, even a guilty plea that was knowing and intelligent may be vulnerable to challenge." (Citations omitted; internal quotation marks omitted.)).

State *v.* Andres C.

renewed his request that the trial court review the journals in camera for *Brady* material after prosecutors had indicated that the journals contained none. This is the majority's panacea: relief "would not have been necessary if the defense had taken advantage of adequate existing procedures." Not exactly. As a practical matter, subpoenaing the journals or asking the court to review them in camera would have been futile. They were in Spanish. For the journals to be of any use to either defense counsel or the trial court, one of them would have had to secure a translation.[10] The majority has not explained why that would be the defendant's obligation. Nor am I aware of any authority that would require the state or the court to accept a translation the defendant secured on his own. In fact, oddly, if the defendant had compelled the production of the journals and had them translated, either for use at trial or for submission to the trial court to review in camera, the prosecutors (the only ones with a duty to review the journals in the first instance for *Brady* material) would be the only ones who had not previously seen the journals, turning the *Brady* process on its head.

IV

At most, the defendant's failure to take advantage of "adequate existing procedures" means his *Brady* claim on appeal is unpreserved. Presumably because of the state's affirmative constitutional obligations under *Brady*, however, "this court has regularly entertained

---

[10] See footnote 4 of this opinion. In its brief to and at argument before this court, the state has repeatedly acknowledged that it would be appropriate for this court to obtain a translation of the journals and review them if this court finds "there was any error in the procedures employed for reviewing and disclosing [the complainant's] journals." In fact, the state suggests that this court assign not one, but "two Judicial Branch interpreters to produce a sealed English translation of the journals." It is not clear to me how employing the services of two interpreters would work, or whose translation would prevail, but the suggestion itself manifests the state's appreciation of the difficulty and imprecision inherent in translating.

State *v.* Andres C.

claims of *Brady* violations that were not distinctly raised at trial, as long as those claims satisfied *Golding*.'' *State* v. *McCoy*, 331 Conn. 561, 598, 206 A.3d 725 (2019); see *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). See generally *State* v. *Rosa*, 196 Conn. App. 480, 501, 230 A.3d 677 (''Despite our Supreme Court's preference to first have the trial court assess the impact of a *Brady* violation, we do not interpret this stated preference as an inviolable rule that any *Brady* claim must first be fully presented and preserved in the trial court or be deemed waived. That would be a derogation of defendants' rights under *Golding*. This court has reviewed unpreserved *Brady* claims under *Golding* when there was *no dispute as to the nature* of the allegedly suppressed evidence.'' (Emphasis added.)), cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020). In fact, when it comes to *Brady* claims, this court has even pressed beyond the dictates of *Golding*'s first prong; see *State* v. *Golding*, supra, 239; at times ordering limited remands to supplement the record so that a reviewing court can determine if the state has complied with its affirmative constitutional obligations under *Brady*.

For example, in *State* v. *Floyd*, 253 Conn. 700, 756 A.2d 799 (2000), following the defendant's conviction, defense counsel received information indicating that one of the state's witnesses had testified pursuant to an undisclosed plea agreement with the state, which it is well established constitutes ''impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*.'' Id., 737. Because this claim came to light postconviction, the record did not contain evidence of the plea agreement for this court to review. See id., 730–31. Invoking our supervisory authority under Practice Book § 60-2, we took the practical step of remanding the case to the trial court for an evidentiary

State *v.* Andres C.

hearing to determine whether a *Brady* violation had occurred. See id., 732. This procedure is now common practice, referred to as a *Floyd* hearing. In *State* v. *Ortiz*, 280 Conn. 686, 911 A.2d 1055 (2006), the state complained that "the *Floyd* hearing procedure is inconsistent with the first prong of *Golding*, which . . . requires the defendant to produce a 'record . . . adequate to review the alleged claim of error' . . . ." (Citation omitted.) Id., 712 n.17. We explained that a *Floyd* hearing "permit[s] the rapid resolution of these fact sensitive constitutional issues and mitigate[s] the effects of the passage of time that would accompany requiring defendants to wait to address these matters until after the conclusion of direct appellate review. Indeed, the potential memory fade attendant to this delay conceivably might even reward the state for violating *Brady*." Id., 714 n.17. We reasoned further that forcing defendants to develop their *Brady* claims "in collateral attacks via habeas corpus proceedings . . . fosters delay as the proceedings on direct appeal are exhausted prior to the commencement of habeas proceedings, and deprives a trial court already familiar with the matter of the opportunity to address *Brady* claims in a timely fashion." Id.

Thus, regardless of how other courts, including federal courts, might handle late arising *Brady* claims, this court has opted, in the exercise of its supervisory authority, to permit a limited remand for fact-finding and review of an otherwise unpreserved *Brady* claim in the defendant's direct appeal. "[S]tate courts are courts of equal dignity with all of the federal 'inferior courts'—to use the [f]ramers' phrase—and state courts have the same duty to interpret and apply the United States [c]onstitution as [federal courts] do." *Pompey* v. *Broward County*, 95 F.3d 1543, 1550 (11th Cir. 1996). *Floyd* is an example of this state court's considering itself free, in undertaking its duty equal to federal

State *v.* Andres C.

courts, to design processes that we determine are best to protect the constitutional rights of our state's citizens, without concerning ourselves with whether we are in lockstep with other courts.

The majority's response to the analogy I have drawn to *Floyd* is to state the obvious: in *Floyd*, we faced an " 'unusual situation . . . .' " Although the present case presents a different situation that that which led us to order a *Floyd* hearing, I suggest that it is also an "unusual" one, and that similar concerns and the same authority warrant a limited remand. In my view, even if this court declines to formulate a prophylactic rule requiring a translation in every situation such as the present case, our rules and case law permit us to order a translation of the journals in this case to reach an appropriate resolution. In particular, I would rely on the same authority that the court invoked in *Floyd*, Practice Book § 60-2, which provides this court with discretion to remedy the record in the present case and in other unusual circumstances, so that we do not need to strain to fit a square peg into the round hole of existing case law. Most particularly, Practice Book § 60-2 provides in relevant part that the court may "on its own motion or upon motion of any party . . . (1) order a judge to take any action necessary to complete the trial court record for the proper presentation of the appeal . . . [and] (8) remand any pending matter to the trial court for the resolution of factual issues where necessary . . . ." See also Practice Book §§ 60-1 and 66-5.

For example, in *State* v. *Pollitt*, 199 Conn. 399, 406–407, 415–16, 508 A.2d 1 (1986), this court sua sponte remanded the case to the trial court for further proceedings to augment the factual record and to explore a *Brady* claim after a state's witness had testified during trial about potentially exculpatory information that the state had not disclosed to the defense. In making this

State *v.* Andres C.

decision, we stressed that "we intimate no view at all on the ultimate merits of the issues''; id., 417; but we explained that a remand was necessary because the appellate record was "not . . . amenable to meaningful appellate review'' without an evidentiary hearing on the *Brady* claim. Id., 415; see id. ("This is so because of, inter alia, relevant [fact bound] determinations necessary to be made to accomplish ultimate appellate resolution of this issue. This court does not find facts.''); see also *State* v. *Gonzales*, 186 Conn. 426, 435–36, 441 A.2d 852 (1982) (remanding case to judge who presided over trial court proceedings for in camera review of witness' statement because materiality of statement could not "be determined by speculation'').

Further, my research has uncovered several cases in which federal courts of appeals and the United States Supreme Court have ordered remands for a district court to supplement the record as necessary to permit a proper resolution of *Brady* claims. See *United States* v. *Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) (remanding case to District Court for in camera review of prosecutor's files because, "although appellants . . . pointed to no specific exculpatory evidence that may have been suppressed,'' presence of potentially exculpatory statements of witnesses in prosecutor's files that were not produced could reveal "the 'tip of an iceberg' of evidence that should have been revealed under *Brady*''); *United States* v. *Dansker*, 537 F.2d 40, 65 (3d Cir. 1976) (when *Brady* claim first raised on appeal, Court of Appeals concluded that it would be "inappropriate to resolve [the] defendants' *Brady* claim in the first instance'' on appeal and remanded case to District Court for that purpose), cert. denied, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977), and cert. denied sub nom. *Valentine* v. *United States*, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977), and cert. denied sub nom. *Diaco* v. *United States*, 429 U.S. 1038, 97 S. Ct.

State *v.* Andres C.

732, 50 L. Ed. 2d 748 (1977); see also *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 43, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) (upholding lower court decision to remand case in which defendant sought confidential records from state child protection agency for *Brady* purposes when, "[a]t this stage . . . it is impossible to say whether any information in the [agency's] records may be relevant to [the defendant's] claim of innocence, because neither the prosecution nor defense counsel has seen the information, and the trial judge acknowledged that he had not reviewed the full file"); *United States* v. *Stillwell*, 986 F.3d 196, 200–201 (2d Cir. 2021) (remanding case "to the District Court to consider, if not fully determine" whether *Brady* violation occurred because there was "no record below," as *Brady* claim was raised in first instance on appeal); *United States* v. *Alvarez*, 358 F.3d 1194, 1209 (9th Cir.) (vacating conviction and remanding case for in camera inspection of probation office's files pertaining to coconspirator witnesses in accordance with *Brady* "[b]ecause neither [the reviewing court] nor the trial court [knew] what it is [the reviewing court was] attempting to review" (internal quotation marks omitted)), cert. denied sub nom. *Valenzuela* v. *United States*, 543 U.S. 887, 125 S. Ct. 126, 160 L. Ed. 2d 148 (2004). In fact, the United States Court of Appeals for the Second Circuit, when faced with potentially exculpatory materials in a different language, has invoked the same practical approach I suggest in the present case. See *United States* v. *Djibo*, 730 Fed. Appx. 52, 55–56 (2d Cir. 2018) (Second Circuit remanded case to District Court for translation of 8000 pages of material from witness' cell phone, including hundreds of pages of conversations in Swahili, after defendant's motion for new trial raised *Brady* claim, because "[t]he translated portions of [the witness'] conversations indicated that there may be information that qualifies as *Brady* . . . material. . . . Without the

State *v.* Andres C.

complete translation . . . it [was] impossible to determine whether [a particular] conversation present[ed] impeachment or exculpatory evidence . . . .''). Outside of the *Brady* context as well, when faced with an unclear or disputed factual record on appeal, this court has remanded cases so that the trial court can make additional findings allowing the trial court or this court to resolve the claim properly. See *Rose* v. *Commissioner of Correction*, 348 Conn. 333, 342 n.6, 342–43, 350, 304 A.3d 431 (2023) (regardless of whether habeas petitioner's ineffective assistance of counsel claim was raised in habeas court, on remand to that court for new hearing and good cause determination under General Statutes § 52-470 (c) and (e), petitioner may raise such claim); *State* v. *Davis*, 338 Conn. 458, 460, 258 A.3d 633 (2021) (remanding case to trial court for hearing regarding potential conflict of interest on part of defense counsel, notwithstanding defendant's failure to allege nature of claimed conflict in motion to dismiss counsel).

With this case law in mind, I conclude that it is entirely appropriate for this court to remand the present case to the trial court to have the complainant's journals translated.[11] The trial court, the state, or both could

---

[11] Another way of looking at what I am suggesting as a way to resolve the present case is through the lens of our supervisory authority cases. First, I would adopt a rule pursuant to our supervisory authority, requiring that prosecutors obtain a certified translation through the Judicial Branch's interpreter and translation services when confronted with evidence in another language before representing to the court whether that evidence contains *Brady* material. See parts II and IV of this opinion. I see this procedural rule as one "that is not constitutionally required" but is "preferable as a matter of policy." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 765, 91 A.3d 862 (2014). Second, I would apply that rule to the defendant's case. Unlike in some cases, however, I do not see a reason to vacate the defendant's conviction but, instead, would apply the rule to the present case by ordering a remand to the trial court for an official translation of the complainant's journals. See *In re Daniel N.*, 323 Conn. 640, 649, 150 A.3d 657 (2016).

State *v.* Andres C.

then undertake to make an appropriate record consistent with *Brady*.

V

Although the majority never mentions the word "habeas," the clear implication of its holding today is that the court will leave the defendant to pursue his claims concerning whether the journals contain *Brady* material in a habeas court.[12] Postponing resolution of the defendant's claim, however, ignores this court's clearly expressed preference for resolving *Brady* claims on direct appeal whenever possible, even if a limited remand to supplement the record is necessary to flesh out the claim, rather than putting off review until a collateral proceeding years down the road. See *State* v. *Ortiz*, supra, 280 Conn. 713–14 n.17.

This path is even more appropriate in the present case because this was a *court trial*. I am particularly at a loss to understand why the majority would not take advantage of Judge Alander's availability and familiarity with this case, given that he was the finder of fact. With no jury to discharge, no similar concepts of finality have kicked in. See *Duart* v. *Dept. of Correction*, 303 Conn. 479, 487–88, 34 A.3d 343 (2012) (posttrial *Brady* motion for new trial implicates standard required for issuing relief that is in part animated by principles of finality of judgment). A remand to the trial court that tried the case would ensure not only the securing of an official translation but, if necessary, would ensure that we would have Judge Alander's view of whether any further exculpatory evidence was "material" to *his* finding of guilt. Judge Alander is uniquely situated in the present case to determine whether anything in the complainant's journals, if exculpatory, would have impacted his determination of guilt under the applicable materiality

---

[12] The defendant in fact has filed a petition for a writ of habeas corpus that is scheduled for trial in June, 2025, in the judicial district of Tolland.

State *v.* Andres C.

standard. See *Jones* v. *State*, 328 Conn. 84, 95–96, 177 A.3d 534 (2018); id., 95 (trial judge who previously presided over case "is unquestionably better suited to assess the impact" of new evidence). The procedure I am suggesting would save the parties and the judicial system time and effort, would provide certainty at an earlier time and, for the complainant, would likely be less intrusive.

VI

To be clear, I do *not*, as the majority suggests, subscribe to the notion that "a *Brady* violation must exist because the nondisclosed portions of the journals necessarily contain impeaching or exculpatory information . . . ." I do not know if the journals contain *Brady* material. On this record, neither do the prosecutors. They are in Spanish. And yet the state has made the representation that they contain no further *Brady* material. Neither the trial court, the parties nor their counsel know what the journals contain because none of these trial participants has read their contents in a language they can comprehend. The majority appears resigned to the fact that, in the present case and many like it, "it is possible that that [*Brady*] information may *never* come to light." (Emphasis in original.) I am not similarly resigned. In my view, our rules and case law provide the tools to combat such resignation. See Practice Book § 60-2; *State* v. *Gonzales*, supra, 186 Conn. 435. I do not believe it requires much ingenuity for our court to adapt a procedure, similar to *Floyd*, to bring finality to this case.

I would therefore, without vacating the judgment of conviction, remand the case to the trial court to order a certified translation of the complainant's journals, which the court should then review in camera. If the state requests a copy of the translated journals to undertake its own review, consistent with its *Brady* obliga-

State *v.* Andres C.

tion, the trial court should grant that request. If, upon review, the trial court finds that the journals contain further exculpatory evidence, the court should go on to determine whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Kyles* v. *Whitley*, supra, 514 U.S. 433–34. If the trial court finds that there was no further exculpatory evidence or that any evidence was not material, it could make an appropriate record for our further review, if necessary. See *State* v. *Gonzales*, supra, 186 Conn. 436. Accordingly, I respectfully dissent from part II of the majority opinion.

ECKER, J., dissenting. In the middle of the defendant's trial for the crimes of sexual assault in the third and fourth degrees and risk of injury to a child, it came to light that the complainant maintained handwritten journals, which she testified on cross-examination were "the best record" of the sexual abuse committed by the defendant, Andres C. The trial court ordered the state to take possession of the journals, which are written in Spanish and total 333 pages,[1] and to review them for "statements" concerning the crimes charged and "any exculpatory material." The prosecutors assigned to the case could not read Spanish. Rather than have the journals translated into English, they delegated their duty of review to a bilingual layperson, an investigator employed by the state's attorney's office. The investigator reported to the prosecutors that no disclosable material existed, and, as a result, the defendant was denied access to the journals. To this day, no lawyer, judge, or trained legal professional has reviewed more

---

[1] The journals were marked as an exhibit for identification at trial and placed under seal. In response to the trial court's inquiry regarding length, the prosecutor estimated that the journals were approximately 200 pages long. In fact, they contain 333 pages of entries.

378 JUNE, 2024 349 Conn. 300

State *v.* Andres C.

than four pages of the complainant's journals to determine whether they contain discoverable statements under our rules of practice or material, favorable information required to be disclosed to the defense under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

The central purpose of a criminal trial is "to ascertain the truth which is the sine qua non of a fair trial." *Estes* v. *Texas*, 381 U.S. 532, 540, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965). In the present case, it is clear to me that a review of an English translation of the complainant's journals for *Brady* material by a trained legal professional familiar with the facts of the case is essential to fulfill the truth seeking function of the defendant's criminal trial. I find it unacceptable that the contents of these journals have been and remain unknown and unknowable to anyone with responsibility for ensuring that justice is done. Given the complainant's testimony that the journals describe the crimes committed by the defendant and constitute "the best record" of the underlying events, and in light of the crucial importance of the complainant's credibility to the outcome of the defendant's trial, I cannot join the majority opinion affirming the defendant's conviction because no member of the legal profession—not the prosecutors, defense counsel, the trial court, the Appellate Court, or any member of this court—has reviewed these journals to determine whether they contain discoverable statements or *Brady* material.

The certified issues in the present appeal[2] cannot be decided until a proper review of the journals is con-

[2] This court certified the following two issues for appellate review: (1) "Did the Appellate Court incorrectly conclude that the defendant had waived his claim that he was entitled to disclosure of the contents of the complainant's journals as the discoverable statements of a witness?" And (2) "[d]id the Appellate Court incorrectly conclude that the *Brady* review . . . of the complainant's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate?" (Citation omitted.) *State* v. *Andres C.*, 342 Conn. 901, 270 A.3d 97 (2022).

State *v.* Andres C.

ducted at the trial court level by a person equipped with the factual and legal knowledge essential to perform that review and to make the necessary judgments regarding disclosure required under our rules of practice and *Brady.* I therefore respectfully dissent. I would retain jurisdiction over the present appeal and remand this case to the Appellate Court with direction to remand it to the trial court and to have that court order the journals translated into English and conduct further proceedings to determine whether the journals, or any portion thereof, contain information subject to disclosure under Practice Book §§ 40-13A and 40-15 (1),[3] or *Brady.*[4]

I

The majority concludes that the complainant's Spanish language journals were not subject to discovery under Practice Book §§ 40-13A and 40-15 (1) because the complainant did not adopt or approve them as her "statement." See part I B of the majority opinion. The majority's conclusion is inconsistent with the well established principle that a witness' intent to adopt or

[3] Practice Book § 40-13A provides: "Upon written request by a defendant and without requiring any order of the judicial authority, the prosecuting authority shall, no later than forty-five days from receiving the request, provide photocopies of all statements, law enforcement reports and affidavits within the possession of the prosecuting authority and his or her agents, including state and local law enforcement officers, which statements, reports and affidavits were prepared concerning the offense charged, subject to the provisions of Sections 40-10 and 40-40 et seq."

I agree with the majority that the definition of the term "statement" in Practice Book § 40-15 (1) "extend[s] to that term as used in [Practice Book] § 40-13A." Part I B of the majority opinion. Pursuant to Practice Book § 40-15 (1), the term "statement" means "[a] written statement made by a person and signed *or otherwise adopted or approved by such person . . . .*" (Emphasis added.)

[4] Although the issue is not before us in the present appeal, I agree with Justice McDonald's observations in his concurring opinion that the complainant's journals also "were most likely discoverable pursuant Practice Book § 40-11" and that "nothing in the majority opinion should be read to preclude such a disclosure under that provision."

State *v.* Andres C.

approve a statement within the meaning of our rules
of practice is a factual question, which, in the absence
of subsidiary factual findings by the trial court, cannot
be decided by this court on appeal. Remand to the trial
court is necessary so that an evidentiary hearing can
be conducted to resolve the factual question as to
whether the complainant's journals were "adopted or
approved" within the meaning of §§ 40-13A and 40-15
(1).

At the outset, I offer two nontrivial observations
regarding procedural matters relating to this aspect of
the appeal. First, the Appellate Court never addressed
the defendant's claim that he was entitled to disclosure
of the journals under Practice Book §§ 40-13A and 40-
15 (1) because it determined that he had waived this
claim in the trial court. See *State* v. *Andres C.*, 208
Conn. App. 825, 853, 266 A.3d 888 (2021) ("[d]efense
counsel agreed to the procedure to be used in the review
of, and potential disclosure of, the contents of the jour-
nals"). Rather than addressing the issue decided by the
Appellate Court and certified by this court on appeal,
the majority rests its holding on altogether different
grounds, namely, that the statements contained in the
journals were not adopted or approved by their author,
the complaining witness.[5]

_____

[5] The Appellate Court incorrectly concluded that the defendant had waived
his claim that he was entitled to the complainant's journals as the dis-
coverable statements of a witness. Promptly upon learning that the journals
existed, defense counsel explicitly requested disclosure of them "as discov-
ery," and, following an off-the-record discussion in chambers between the
trial court, the prosecutors, and defense counsel, the trial court ordered the
state to take possession of the journals and "to determine, what, if anything
in those journals . . . *comprise statements by [the complainant] concern-
ing the incidents in question*" and to "disclose to defense counsel any such
material, *specifically, statements made by [the complainant] in her journals
concerning the sexual assault allegations* . . . ." (Emphasis added.) The
trial court refined this order the next day as it related to *Brady* material,
but it never expressly modified the order with respect to the production of
statements subject to disclosure under the rules of practice. Although
defense counsel's request did not refer specifically to Practice Book § 40-
13A, the terminology used by defense counsel and the trial court reflects

State *v.* Andres C.

Second, the ground on which the majority relies, i.e., that the contents of the journals were not adopted or approved by the author of the journals, is not a proper basis at this time for deciding the issue presented. To begin with, it is important to understand that not a single aspect of the majority's analysis—not one case citation or any thread of legal reasoning—has been the subject of briefing or argument by either party to this case, ever, in any court. The state did not raise this issue (or any other merits based issue regarding the defendant's claim that the state was obligated to disclose the journals as statements) in the Appellate Court. Nor did the state comply with the requirements of Practice Book § 84-11 (b) by requesting special permission to raise the issue in this court as an alternative ground for affirming the Appellate Court's judgment. See Practice Book § 84-11 (b) ("If such alternative grounds for affirmance . . . were not raised in the Appellate Court, the party seeking to raise them in the Supreme Court

their understanding that all "statements . . . prepared concerning the offense charged" would be disclosed to the defense consistent with this rule of practice. Practice Book § 40-13A; see, e.g., *State* v. *Santana*, 313 Conn. 461, 468, 97 A.3d 963 (2014) (claim is not unpreserved simply because defendant did "not use the term of art applicable to the claim, or cite to a particular statutory provision or rule of practice," if defendant "argued the underlying principles or rules at the trial court level"); *State* v. *Gonzales*, 186 Conn. 426, 433, 441 A.2d 852 (1982) (failure to cite applicable rule of practice was not fatal to defendant's claim when "the . . . record demonstrates no misunderstanding about what the defendant was seeking and why"). The state never complied with the trial court's order as it relates to statements, and the record reflects that defense counsel never withdrew his request for disclosure of the statements contained in the complainant's journals. On this record, the defendant's claim is preserved and was not waived. Cf. *State* v. *Johnson*, 316 Conn. 45, 55, 111 A.3d 436 (2015) (claim that is initially preserved is not subsequently waived if defendant did not "engag[e] in affirmative conduct that unequivocally demonstrated his intention to abandon the previously preserved objection" (emphasis omitted; internal quotation marks omitted)); *State* v. *Thomas W.*, 301 Conn. 724, 734–35, 22 A.3d 1242 (2011) (claim that is initially preserved at trial is not subsequently waived through defense counsel's inaction if that inaction is due to "inadverten[ce]" rather than "a strategic decision").

382                        JUNE, 2024                        349 Conn. 300

State *v.* Andres C.

must move for special permission to do so prior to
the filing of that party's brief. Such permission will be
granted only in exceptional cases where the interests
of justice so require."). Nor, finally, did the state brief
the "adopted or approved" requirement in this court.[6]
Instead, the state's position in this court is staked
entirely on its claim that the term "statement" should
be construed to apply "only to oral or written communi-
cations *conveyed to an investigating government agent*"
consistent with the Jencks Act, 18 U.S.C. § 3500. (Emphasis
added.) Rather than reject that claim on its merits
(because there is no such requirement) or request sup-
plemental briefing on the unbriefed issue, the majority
proceeds to rest its decision on the resolution of that
difficult and novel issue,[7] without input from the parties.
This fact, in combination with the lack of the critical
factual findings necessary to properly dispose of the
issue on appeal, supports my view that a remand is
necessary so that the trial court can properly adjudicate
*all* of the issues in the first instance.

---

[6] The state argues, in a single conclusory sentence in its brief to this court,
that the complainant "neither signed nor otherwise adopted or approved
the journals. Cf. Practice Book § 40-15 (1)." The state fails to cite any case
law or record facts in support of this argument. The state's briefing on this
issue is plainly inadequate to permit meaningful appellate review. See, e.g.,
*Maldonado* v. *Flannery*, 343 Conn. 150, 183 n.17, 272 A.3d 1089 (2022)
("[When] an issue is merely mentioned, but not briefed beyond a bare
assertion of the claim, it is deemed to have been waived. . . . [M]ere conclu-
sory assertions regarding a claim, with no mention of relevant authority
and minimal or no citations from the record, will not suffice." (Internal
quotation marks omitted.)).

[7] The difficult and novel issue is whether a complaining witness has
"adopted or approved" statements contained in her own handwritten jour-
nals that describe the crimes charged. Practice Book § 40-15 (1). Resolution
of this issue is challenging because there is no case law directly on point.
The federal case law on which the majority relies to arrive at its holding
involves the field notes of government agents, which is a far cry from a
complaining witness' firsthand narrative of events in a personal journal
described by the witness as "the best record" of what happened. Members
of this court may ultimately disagree about the correct resolution of the
issue, but we should agree that we should not reach any conclusion without
full briefing.

State *v.* Andres C.

The majority's conclusion that the complainant did not adopt or approve her journals in accordance with Practice Book §§ 40-13A and 40-15 (1) is predicated on its erroneous assertion that "the issue of whether a witness' personal journals constitute a disclosable statement within the meaning of the rules of practice presents a pure question of law on this record . . . ." Part I A of the majority opinion. Specifically, the majority states that "whether a statement has been approved or adopted for purposes of the rules of practice may be a mixed question of fact and law, with the historical facts subject to review for clear error and the legal question of whether the established subsidiary facts constitute adoption or approval subject to plenary review," but concludes that "[t]here is no factual issue in the present case because the relevant subsidiary facts . . . are undisputed." Footnote 11 of the majority opinion. That is not so. It is well established under our case law that the adoption or approval of a witness' statement is a pure question of fact for the trial court in the first instance. See *State* v. *Anonymous (83–FG)*, 190 Conn. 715, 734–36, 463 A.2d 533 (1983) (remanding case for hearing to determine whether witness' unsigned field notes were adopted or approved under rules of practice); see also *State* v. *Cepeda*, 51 Conn. App. 409, 435, 723 A.2d 331, cert. denied, 248 Conn. 912, 732 A.2d 180 (1999); *State* v. *Black*, 23 Conn. App. 241, 244, 579 A.2d 1107, cert. denied, 216 Conn. 827, 582 A.2d 204 (1990).[8]

---

[8] As the majority correctly observes, the adoption or approval requirement is derived from the Jencks Act, 18 U.S.C. § 3500, and "this court consistently has relied on the history and judicial interpretations of the Jencks Act when constructing [Practice Book] § 40-15 and related rules of practice." Part I B of the majority opinion; see, e.g., *State* v. *Johnson*, 288 Conn. 236, 278, 951 A.2d 1257 (2008). The United States Supreme Court and the federal courts of appeals, like the courts of this state, consistently have held that whether a statement has been adopted or approved by a witness is a question of fact for the trial court in the first instance, which "may not be disturbed unless clearly erroneous." *Campbell* v. *United States*, 373 U.S. 487, 493, 83 S. Ct. 1356, 10 L. Ed. 2d 501 (1963); see, e.g., *Goldberg* v. *United States*, 425

State *v.* Andres C.

Although the trial court ordered the state to provide the defendant with any "statements made by [the complainant] in her journals concerning the sexual assault allegations," it did not make any explicit factual findings as to whether the complainant adopted or approved her Spanish language journals within the meaning of Practice Book §§ 40-13A and 40-15 (1). The majority nonetheless concludes that this court can resolve the issue for the first time on appeal because "the relevant subsidiary facts—namely, the complainant's statements about the journals during her testimony—are undisputed." Footnote 11 of the majority opinion. This also is not correct. The relevant factual issue is whether the complainant's statements evince her intent to stand by or vouch for the content of her journals. See, e.g., *United States* v. *Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995) (statement is adopted or approved if witness "vouches for . . . or intends to be accountable for [its] contents"). It is beyond dispute that intent is a question of fact to be resolved by the fact finder. Cf. *State* v. *Hedge*, 297 Conn. 621, 658–59, 1 A.3d 1051 (2010) ("[i]t is well established that the question of intent is purely a question of fact . . . the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one" (internal quotation marks omitted)). In the present case, the complainant's intent in this regard is hotly disputed.

U.S. 94, 108–10, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976); *United States* v. *Smith*, 31 F.3d 1294, 1301 (4th Cir. 1994), cert. denied, 513 U.S. 1181, 115 S. Ct. 1170, 130 L. Ed. 2d 1124 (1995); *United States* v. *Wallace*, 848 F.2d 1464, 1470 n.7 (9th Cir. 1988); *United States* v. *Judon*, 581 F.2d 553, 554–55 (5th Cir. 1978).

The majority departs from this uniform body of law on the basis of *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 264, 112 A.3d 1 (2015), and *Bridgeport* v. *Plan & Zoning Commission*, 277 Conn. 268, 275, 890 A.2d 540 (2006), but these cases, which have nothing to do with the adoption or approval requirement in Practice Book §§ 40-13A and 40-15 (1), do not support the majority's conclusion. See footnote 11 of the majority opinion.

State *v.* Andres C.

At trial, the complainant testified that her therapist "would have me write a lot [in the journals] about either my relationship to [the defendant], with him, *how the abuse happened.* I would reflect a lot on how it made me feel, [what] I was missing, why I didn't want to talk. Sometimes in the journal, we'd write about—like if I was having family fights, *so my journals are the abuse that I lived with him*, but also family fights with my siblings [and] with my mom." (Emphasis added.) The complainant testified that her journals were her "words through therapy" and acknowledged that she had reviewed "a few pages" before testifying in court. The journals were written "closer [in time] to the abuse" and, according to the complainant, are "*the best record . . . of what happened . . . .*" (Emphasis added.)

This testimony is more than sufficient to support a reasonable inference that the complainant was willing to, and indeed did, evince her intent to " 'stand by the statement[s]' " in her journals, "vouch for" their contents, and "be held accountable for inconsistencies between the journals and her testimony at trial."[9] Why would the complainant testify under oath that the journals describe "how the abuse happened" and "the abuse that [she] lived with [the defendant]," and that they were "the best record" of the abuse, if she had not been willing to stand by her journals and be held accountable for their contents, including any inconsistencies between the journals and her testimony at trial? Likewise, why

—————
[9] It is not clear what additional testimony, other than a formal, on the record canvass or advisement, would, in the majority's view, be sufficient to reflect the complainant's intention to "be held accountable in court for any omissions or inaccuracies in the journals, or that they could be used for cross-examination and impeachment purposes." Text accompanying footnote 14 of the majority opinion. I have found no case law, and the majority cites to none, requiring a formal canvass or advisement as a necessary predicate to the trial court's factual finding that a witness has adopted or approved a prior narrative description of the offense charged within the meaning of Practice Book §§ 40-13A and 40-15 (1).

State *v.* Andres C.

would the complainant review her journals before testifying regarding the defendant's alleged sexual abuse, if not to refresh her recollection regarding the defendant's abusive conduct? I find it telling that the trial court explicitly found that the complainant "used some pages of the journals to refresh her memory [before] coming into court and testifying."[10]

I recognize that there also was testimony that one page of the complainant's journals involved a counterfactual therapeutic exercise. Specifically, one single page, out of more than three hundred pages of handwritten journal entries, was translated and ordered to be disclosed to the defense as exculpatory material under *Brady*. See footnote 21 of this opinion. The complainant was questioned as to that specific entry, which pertained to sexual abuse allegedly perpetrated by someone other than the defendant. The complainant testified that this particular journal entry was the product of a "prompt" by her therapist "to rewrite [her] history of abuse." According to the complainant, she "imagined what it would've looked like to actually speak out [about the abuse]" by telling her mother, but she "never [actually] went and told [her] mother . . . . [I]n real life, this conversation didn't happen . . . ." The prompt was a therapeutic exercise "to understand that this is what it should've looked like to be able to talk about abuse in a normal family."

---

[10] The trial court exercised its discretion to deny the defendant's request for disclosure of the journals under § 6-9 of the Connecticut Code of Evidence in light of (1) "the fact that [the complainant] testified that she . . . used [only] a few pages of [the] journals that consist of . . . at least, apparently, a couple hundred pages," (2) "the fact that the state would be reviewing all the journals with the obligation to turn over any exculpatory evidence to the defendant," and (3) "the private nature of [the] journals." See Conn. Code Evid. § 6-9 (b) ("[i]f a witness, before testifying, uses an object or writing to refresh the witness' memory for the purpose of testifying, the object or writing need not be produced for inspection unless the court, in its discretion, so orders"). The trial court's ruling under the Code of Evidence is not before us on appeal.

State *v.* Andres C.

Thus, according to the complainant, one discrete journal entry was a counterfactual therapeutic exercise, but there is no evidence to support the suggestion that *all* of the complainant's journal entries were counterfactual or fictional in nature. As a matter of fact, the evidence is to the contrary. The complainant previously testified that her journals describe ''how the abuse happened'' and constitute ''the best record'' of the defendant's abusive conduct. A reasonable fact finder certainly could decide that some journal entries were not adopted or approved by the complainant while other journal entries (including the ones that the complainant used to refresh her recollection of the defendant's abusive conduct, as well as the entries described as ''the best record'' of the defendant's abuse) were adopted or approved by the complainant. Insofar as the evidence could be construed as conflicting, it is the role of the trial court as the fact finder, not the state's investigator or this court, to resolve the conflict. See, e.g., *State* v. *Samuel U.*, 348 Conn. 304, 321, 303 A.3d 1175 (2023) (recognizing that, in certain contexts, trial court must make ''factual findings . . . when determining the admissibility of evidence''); cf. *State* v. *Crespo*, 246 Conn. 665, 679, 718 A.2d 925 (1998) (''[i]n a case in which the evidence is conflicting, it is the quintessential [fact finder] function to reject or accept certain evidence, and to believe or disbelieve any . . . testimony'' (internal quotation marks omitted)), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

Finally, but not inconsequentially, to the extent that the majority concludes that the complainant's journal entries were not discoverable statements because they were written as part of ''therapy exercises in which she was encouraged to imagine hypothetical assaults and counterfactual family environments''; part I B of the majority opinion; I fail to understand why these journal entries were not material information favorable to the

State *v.* Andres C.

defense that was therefore required to be disclosed under *Brady*.[11] See part II of this opinion. Fabricated claims of abuse, including statements used by the complainant to refresh her recollection regarding a criminal defendant's allegedly abusive conduct before testifying at trial, plainly constitute impeachment material. To the extent that some or all of the journal entries contain inaccurate factual statements that were written by the complainant but not adopted or approved by her, the state's failure to disclose this material supports the defendant's claim that the *Brady* review conducted in this case was constitutionally inadequate. See part II of this opinion.

In a case such as this one, in which the trial court fails to make the requisite factual findings as to whether a witness adopted or approved a discoverable statement

---

[11] The majority finds "no reason to believe" that the journals contain *Brady* material because "[a]ny descriptions of the defendant's sexual abuse contained in the journals could be purely inculpatory and consistent with the complainant's trial testimony" and because there is no evidence that "the journals contained '[f]abricated claims of abuse,' other than the counterfactual account that was disclosed." Footnote 14 of the majority opinion. The fact that we do not know whether the journals contain *Brady* material is my entire point. I could not disagree more, however, with the assertion that we have "no reason to believe" that there is anything exculpatory or inconsistent in the more than 300 pages of entries withheld by the prosecutors. Indeed, notwithstanding the prosecutors' assurances to the contrary, one of the four pages reviewed by the trial court *did* contain *Brady* material, which is reason enough to sustain a reasonable belief that judicial oversight was necessary. See footnote 21 of this opinion. We know from the complainant's own testimony that the journals contain her extensive, firsthand description of the crimes of which the defendant was convicted, and we also know that the journals contain at least one instance in which the complainant fabricated a claim of abuse. If that does not give us reason to believe that the journals may contain impeachment material, I do not know what would trigger the need for in camera examination short of proof of an actual violation, which, of course, is impossible to demonstrate prior to disclosure. For this reason, to prevail on his *Brady* claim on appeal, the defendant "need only 'make some plausible showing' that exculpatory [or impeachment] material exists." *United States* v. *King*, 628 F.3d 693, 703 (4th Cir. 2011). Without any doubt, that showing has been made. See part II of this opinion.

State *v.* Andres C.

under our rules of practice, the appropriate remedy is to remand the case to the trial court with direction to "supplement the record with findings" that will facilitate "appellate review on the augmented record." *Goldberg* v. *United States*, 425 U.S. 94, 111, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976); see, e.g., *State* v. *Anonymous (83–FG)*, supra, 190 Conn. 736. Accordingly, I would retain jurisdiction over the present appeal and remand the case to the trial court for an evidentiary hearing. See Practice Book § 60-2 (this "court may, on its own motion or upon motion of any party . . . (1) order a judge to take any action necessary to complete the trial court record for the proper presentation of the appeal . . . [or] (8) remand any pending matter to the trial court for the resolution of factual issues where necessary").

## II

In the seminal case of *Brady* v. *Maryland*, supra, 373 U.S. 83, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id., 87. A prosecutor has a constitutional duty of disclosure under *Brady*, even if there has been no request by the accused,[12] the evidence is impeaching but not necessarily exculpatory in nature,[13] or the prosecutor has no personal knowledge of the evidence, but

[12] See *United States* v. *Agurs*, 427 U.S. 97, 110, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) ("there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request").

[13] See *United States* v. *Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) ("[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule" because "[s]uch evidence is . . . favorable to an accused . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal" (citation omitted; internal quotation marks omitted)).

State *v.* Andres C.

other governmental actors do. See *Kyles* v. *Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). With respect to the latter category of evidence, the United States Supreme Court has emphasized that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case" and must implement "procedures and regulations . . . to [ensure the] communication of all relevant information on each case to every lawyer who deals with it." (Internal quotation marks omitted.) Id., 437–38. The duty of disclosure under *Brady* rests with the prosecutor because of "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler* v. *Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). More specifically, the individual prosecutors assigned to each particular case are personally responsible for implementing the procedures necessary to ensure *Brady* compliance because they alone are familiar with the disclosed and undisclosed evidence and have the specialized legal knowledge, training, and skill necessary "to gauge the likely net effect of all such evidence [collectively]" and to determine whether disclosure is required to satisfy the demands of due process. *Kyles* v. *Whitely*, supra, 437.

The majority concludes that the prosecutors in the present case fulfilled their constitutional duty under *Brady* and its progeny, even though they did not—and, without obtaining an English language translation, could not—read or familiarize themselves with the contents of the complainant's Spanish language journals, which, according to the complainant, contain "the best record" of the sexual abuse for which the defendant was convicted. To this day, no lawyer, judge, or other trained legal professional has reviewed these journals to determine whether they contain either exculpatory material that could be used to raise doubt about the

State *v.* Andres C.

defendant's guilt or as impeachment material that could be used to challenge the trial testimony of the complainant, whose credibility was determinative of the outcome of the case. Instead, the prosecutors delegated this crucial task to a bilingual investigator employed by the state's attorney's office—a nonlawyer who apparently has no specialized training in the constitutional requirements of *Brady* or the translation of written foreign language documents. Given the profound significance of the journals as "the best record" of the alleged sexual abuse, the lack of any evidence in the record of the investigator's qualifications to review the complainant's Spanish language journals for *Brady* material, and the prosecutors' failure to implement any procedures by which they would learn personally of the content of the journals, I believe it is clear that the constitutional requirements of *Brady* have not been satisfied.[14] Accordingly, I would remand the case to the trial court with direction to order the journals translated into English and to review them in camera for *Brady* material.

It is no accident that the law places the obligation to comply with the requirements of *Brady* squarely on the shoulders of the individual prosecutor or prosecutors trying the case. As the Appellate Court observed and the majority acknowledges, "the individual prosecutor or prosecutors trying a specific case bear the ultimate responsibility for compliance with the disclosure of evidence as required by *Brady* and its progeny." *State* v. *Andres C.*, supra, 208 Conn. App. 857; see part II of the majority opinion. The prosecutors are the "archi-

_____

[14] Although, in my view, the *Brady* review in this case failed to comport with constitutional requirements, I also agree with Justice D'Auria's concurrence and dissent that, insofar as the scope of the prosecutor's constitutional duties are uncertain, a remand to the trial court for an English language translation and in camera review of the complainant's journals is necessary "either as a prophylactic rule or in this case alone" under the unusual circumstances presented. Part II of the concurring and dissenting opinion.

State *v.* Andres C.

tect[s]'' of the criminal trial; *Brady* v. *Maryland*, supra, 373 U.S. 88; and ''the final arbiters of the government's obligation to ensure fair trials.'' *Kyles* v. *Whitley*, supra, 514 U.S. 438. The United States Supreme Court has emphasized that the prosecutor has an affirmative ''duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'' Id., 437. ''[T]he prosecutor has the means to discharge the government's *Brady* responsibility'' by establishing ''procedures and regulations'' ensuring the ''communication of all relevant information on each case to every lawyer who deals with it.'' (Internal quotation marks omitted.) Id., 438. The prosecutors' responsibility under *Brady* is not merely ceremonial or titular. Their role is meaningful, active, and substantive.

It should be obvious why the ultimate duty of disclosure under *Brady* rests with the prosecutors assigned to the case. First, *Brady* encompasses a set of technical and nuanced legal rules, and the prosecutors have the specialized legal knowledge, training, and experience necessary to comply with *Brady*'s disclosure requirements. The United States Supreme Court has emphasized precisely this point in a case involving civil liability for failure to train prosecutors on compliance with *Brady*'s requirements, pointedly observing that prosecutors ''are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment.'' *Connick* v. *Thompson*, 563 U.S. 51, 64, 131 S Ct. 1350, 179 L. Ed. 2d 417 (2011); see id., 54. Prosecutors ''know what *Brady* entails and [how] to perform legal research when they are uncertain.'' Id., 67.

*Brady* requires not only a comprehensive understanding of the applicable legal rules, but also the professional training and acumen to exercise the *judgment* required to properly apply those rules to the unique factual context of any given case. Determining whether

State *v.* Andres C.

a particular piece of evidence is favorable and material within the meaning of *Brady* typically requires the exercise of legal judgment and expertise that only the prosecutors assigned to the case, with their knowledge of *Brady*'s constitutional requirements and their familiarity with all of the other evidence, are in a position to make. See, e.g., *Moldowan* v. *Warren*, 578 F.3d 351, 401–402 (6th Cir. 2009) (Kethledge, J., concurring in the judgment in part and dissenting in part) ("the *Brady* duty is uniquely tailored to prosecutors" because it requires exercise of "a judgment that prosecutors . . . are trained to make"), cert. denied, 561 U.S. 1038, 130 S. Ct. 3504, 177 L. Ed. 2d 1114 (2010). As the United States Supreme Court has observed, "*Brady* has gray areas and some *Brady* decisions are difficult . . . ." *Connick* v. *Thompson*, supra, 563 U.S. 71. A nonlawyer without intimate knowledge of the case—an investigator, for example—generally is unequipped to make those decisions.

Second, prosecutors are bound by unique ethical obligations, both as attorneys admitted to practice law[15]

[15] As attorneys, prosecutors are required to "satisfy character and fitness standards . . . and are personally subject to an ethical regime designed to reinforce the profession's standards." *Connick* v. *Thompson*, supra, 563 U.S. 65. A prosecutor "who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment." Id., 66; see, e.g., *Statewide Grievance Committee* v. *Ganim*, 311 Conn. 430, 452, 87 A.3d 1078 (2014) ("An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege [that] has been accorded him. His admission is [on] the implied condition that his continued enjoyment of the right conferred is dependent [on] his remaining a fit and safe person to exercise it . . . ." (Internal quotation marks omitted.)); *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 51, 818 A.2d 14 (2003) ("[g]ood moral character is a necessary and proper qualification for admission to the bar [in this state]" (internal quotation marks omitted)); see also General Statutes § 51-84 (b) (providing Superior Court with authority to "fine an attorney for transgressing its rules and orders . . . [and to] suspend or displace an attorney for just cause"); Practice Book § 2-44 ("[t]he Superior Court may, for just cause, suspend or disbar attorneys").

State *v.* Andres C.

and as representatives of the state in a criminal prosecution. "It is well established that [a] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done . . . ." (Internal quotation marks omitted.) *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 186–87, 243 A.3d 1163 (2020). "As a representative of the people of the state, [the prosecutor] is under a duty not solely to obtain convictions but, more importantly, (1) to determine that there is reasonable ground to proceed with a criminal charge . . . (2) to see that impartial justice is done [in the case of] the guilty as well as the innocent; and (3) to ensure that all evidence tending to aid in the ascertaining of the truth be laid before the court, whether it be consistent with the contention of the prosecution that the accused is guilty." (Citation omitted; internal quotation marks omitted.) *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 556–57, 663 A.2d 317 (1995); see Rules of Professional Conduct 3.8, commentary (prosecutor is "a minister of justice" with "[the] specific [obligation] to see that the defendant is accorded procedural justice and that guilt is decided [on] the basis of sufficient evidence"). A prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (Internal quotation marks omitted.) *Strickler* v. *Greene*, supra, 527 U.S. 281.

*Brady* and its progeny, in short, serve as "central bulwarks against injustice in our criminal justice system." *Gonzalez* v. *Wong*, 667 F.3d 965, 981 (9th Cir. 2011), cert. denied sub nom. *Chappell* v. *Gonzales*, 568 U.S. 928, 133 S. Ct. 155, 184 L. Ed. 2d 234 (2012); see also *United States* v. *Bagley*, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) ("[t]he *Brady* rule is

State *v.* Andres C.

based on the requirement of due process,'' and its purpose is "to ensure that a miscarriage of justice does not occur''). It is not a mere procedural "discovery rule, but a rule of fairness and minimum prosecutorial obligation.'' *United States* v. *Beasley*, 576 F.2d 626, 630 (5th Cir. 1978), cert. denied, 440 U.S. 947, 99 S. Ct. 1426, 59 L. Ed. 2d 636 (1979). "By requiring the prosecutor to assist the defense in making its case," *Brady* is premised on the principle "that the prosecutor's role transcends that of an adversary . . . .'' *United States* v. *Bagley*, supra, 675 n.6. As ministers of justice, the prosecutors trying the case have "a special duty commensurate with [their] unique power, to [ensure] that defendants receive fair trials.'' (Internal quotation marks omitted.) *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 187.

My analysis thus begins with the premise that the prosecutor occupies a unique role in executing the legally complex and fact dependent disclosure obligation under *Brady*, and a layperson with no specialized training or education ordinarily is not equipped with the knowledge, skill, and judgment necessary to comply with *Brady*'s constitutional requirements.[16] This is most certainly true in a case such as this one, which required the prosecutors to review hundreds of pages of journal entries, written by the complaining witness herself, regarding the very events at the center of the criminal charges against the defendant. In this context, giving a nonlawyer investigator a brief, midtrial, backroom lecture on "*Brady* in a nutshell" is a grossly inadequate substitute for the kind of legal education, training, and experience that would qualify a person to conduct the meaningful review that *Brady* mandates.[17]

---

[16] As I discuss later in this opinion, I do not rule out the possibility that a nonlawyer may conduct a constitutionally adequate *Brady* review under certain discrete circumstances, such as, for example, reviewing law enforcement personnel files for disciplinary information contained in records within the custody or control of a separate agency.

[17] At trial, the prosecutors informed the trial court that their investigator had been employed "with the state's attorney's office for fifteen years, [that]

A brief examination of the circumstances of this case demonstrates the flawed nature of the procedures utilized by the prosecutors to discharge their *Brady* obligations. To begin with, even if I were to assume, purely for the sake of argument, that the investigator was informed in general terms of the constitutional duty of disclosure under *Brady*, there is no basis in the record to suggest that the investigator was familiar with the large volume of factual information and the manifold underlying legal principles necessary to properly apply *Brady* under the particular circumstances of this case. In terms of the facts, we have no reason to think that the investigator was made aware of or had the requisite familiarity with the complainant's pretrial statements or trial testimony, which was necessary to determine whether the description of events set forth in her journals ("the best record" of what happened) was inconsistent with the version of events detailed in those pretrial statements and her testimony. Without access to the complainant's other descriptions of the abuse, including the account of events she gave in her trial testimony, it was impossible for the investigator to determine whether there were any inconsistent statements in the complainant's Spanish language journals that were required to be disclosed to the defense.

There also is no indication that the investigator was familiar with the complex and nuanced legal definition of an "inconsistent statement," which was necessary to review the complainant's journals for *Brady* material. "Inconsistent statement" is a legal term of art that

she has been an investigator in [the] office for five years, [that] she is bilingual, [and that] she is a 2013 graduate of Albertus Magnus College with a major in criminal justice. She was instructed very carefully . . . as far as what she was looking for; [the prosecutors assigned to the case] explained to her very carefully what the state's obligation is for exculpatory and *Brady* material." According to the prosecutors, the investigator "spent about ten hours reviewing [the Spanish language journals] . . . and, whenever she had any questions, she would talk to" the prosecutors assigned to the case.

State *v.* Andres C.

means something very different to licensed attorneys than to laypersons. A prior statement not only is inconsistent under the law if it directly contradicts a later statement, but it also meets the legal definition if it includes "omissions, changes of position, denials of recollection or evasive answers." Conn. Code Evid. § 6-10 (a), commentary. "Inconsistency in effect, rather than contradiction in express terms, is the test," and, thus, "[i]n determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined." (Internal quotation marks omitted.) *State* v. *Whelan*, 200 Conn. 743, 748 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Additionally, "the inconsistency must be substantial and relate to a material matter." (Emphasis omitted.) *State* v. *Richardson*, 214 Conn. 752, 763, 574 A.2d 182 (1990). Without a full and accurate comprehension of the legal definition of an inconsistent statement, and without a detailed understanding of the complainant's trial testimony, the investigator could not possibly review the complainant's journals for any inconsistent statements that could be used to impeach the complainant's credibility.

Moreover, trained lawyers know that impeachment material is not limited to inconsistent statements, but also includes other evidence that might affect a witness' credibility, such as evidence of bias, motive, interest, or reputation for truthfulness. "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the] general rule [of disclosure under *Brady*]." (Internal quotation marks omitted.) *Giglio* v. *United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). In this case, the reliability of the complainant's testimony was outcome determinative. There was no physical evidence that the defendant com-

State *v.* Andres C.

mitted the crimes charged; nor did anyone witness the sexual abuse at the time it occurred. The state's case hinged entirely on the testimony of a complainant who was a child at the time of the sexual abuse, and her credibility was the crucial factor in the case. See, e.g., *State* v. *Fernando V.*, 331 Conn. 201, 215–16, 202 A.3d 350 (2019). Any evidence that would have affected the trier of fact's assessment of the complainant's credibility was material and subject to disclosure under *Brady*. See *State* v. *White*, 229 Conn. 125, 136–37, 640 A.2d 572 (1994) ("[t]his court has stated many times that when the prosecution's case hinges entirely on the testimony of certain witnesses, information affecting their credibility is material [under *Brady*]"); *Demers* v. *State*, 209 Conn. 143, 161–62, 547 A.2d 28 (1988) (if "a conviction depends entirely [on] the testimony of certain witnesses . . . information affecting their credibility is material in the constitutional sense [i.e., under *Brady*, because] . . . if they are not believed a reasonable doubt of guilt would be created" (internal quotation marks omitted)). On this record, there is no reason to believe (and good reason to doubt) that the state's investigator possessed the technical knowledge or training to properly review the complainant's Spanish language journals for any such impeachment information. Nor does anything in the record indicate that she even attempted to do so.[18]

Again, purely for the sake of argument, even if I were to assume that the prosecutors' ad hoc *Brady* tutorial conveyed to the investigator all pertinent aspects of the *Brady* doctrine and that the investigator absorbed from the prosecutors' lesson all of the legal learning required to identify impeachment material, the investigator

---

[18] Although the prosecutors instructed the investigator to review the complainant's Spanish language journals for inconsistent statements, there is no indication that they also instructed the investigator to review the complainant's journals for other types of impeachment evidence, such as evidence of bias, motive, interest, or reputation for truthfulness.

State *v.* Andres C.

nonetheless could not conduct a constitutionally adequate *Brady* review because she was in no position to exercise the discretion or judgment necessary to determine whether any potentially inconsistent statements and impeachment material triggered a disclosure obligation under *Brady*. Except perhaps in the most straightforward cases involving no exercise of judgment, the decision to disclose under *Brady* is not a ministerial task. "[T]here are no bright lines or fixed rules," and many scholars, courts, and attorneys have struggled to delineate the precise contours of a prosecutor's constitutional duty of disclosure under *Brady*. B. Gershman, "Between *Brady* Discretion and *Brady* Misconduct," 123 Dick. L. Rev. 661, 670 (2019); see id., 662 (examining various hypothetical situations that require prosecutor "to exercise considered judgment, or discretion"); see also *Connick* v. *Thompson*, supra, 563 U.S. 71 ("*Brady* has gray areas and some *Brady* decisions are difficult"); *Kyles* v. *Whitley*, supra, 514 U.S. 439 (under *Brady*, prosecutors are "forced to make judgment calls about what would count as favorable evidence, owing to the very fact that the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record"); *United States* v. *Sipe*, 388 F.3d 471, 488 (5th Cir. 2004) ("materiality determinations under *Brady* are always difficult"). Stated simply, the *Brady* review in the present case required extensive legal training, comprehensive knowledge of the legal and factual issues at issue, and the exercise of judgment—none of which the state's investigator possessed based on the trial court record before us.

The deficiencies in the state's review procedures do not stop there. There is no indication in the record that the state's investigator even possessed the foreign language qualifications necessary to read and translate written documents. The investigator was bilingual, but

State *v.* Andres C.

an understanding of the Spanish and English languages alone provides no assurance of linguistic competence for purposes of the kind of detailed and nuanced review necessary to ensure *Brady* compliance. The Spanish language is not monolithic—"there are more than nineteen dialectical forms of Spanish . . . ." (Internal quotation marks omitted.) I. Dominguez-Urban, "The Messenger as the Medium of Communication: The Use of Interpreters in Mediation," 1997 J. Disp. Resol. 1, 30. Given the existence of these different dialects, "Spanish speakers from different countries are not necessarily able to communicate effectively. Even within the same country, there may be regional and class differences in dialect or accent. The failure to recognize these differences can lead to [miscommunications and] disastrous consequences."[19] Id.

The provision of translation and interpretation services is "an imprecise process" that easily "may give rise to misunderstanding and misinterpretation of the speaker's intent." M. Shulman, Note, "No Hablo Inglés: Court Interpretation as a Major Obstacle to Fairness for Non-English Speaking Defendants," 46 Vand. L. Rev. 175, 176–77 (1993). To ameliorate these risks, court-appointed translators for the Connecticut Judicial Branch must pass written, oral, and ethics examinations, agree to be bound by the Code of Professional Responsibility for Court Interpreters of the Judicial Branch, and be sworn by a Superior Court judge. See Connecticut Judicial Branch, Interpreter and Translator Services Unit

[19] For example, a person "hearing the Spanish world 'molestar' may believe that a sexual molestation is being described. In fact, the word is correctly translated as 'to bother' rather than 'to molest.' " I. Dominguez-Urban, supra, 1997 J. Disp. Resol. 25 n.133; see also, e.g., M. Shulman, Note, "No Hablo Inglés: Court Interpretation as a Major Obstacle to Fairness for Non-English Speaking Defendants," 46 Vand. L. Rev. 175, 176 and n.3 (1993) (explaining that, depending on dialect and context, Spanish word " 'kilo' " can mean either " 'kilogram' " or " 'cent,' " and that improper translation of this word at trial resulted in wrongful conviction on drug charges).

State *v.* Andres C.

(ITS), available at https://jud.ct.gov/jobs/interpreter.htm#Role (last visited June 11, 2024). These requirements ensure that the translator possesses the foreign language proficiency necessary to translate written documents and understands the ethical obligation to translate "accurately and faithfully without indicating any personal bias, avoiding even the appearance of partiality." Connecticut Judicial Branch, Code of Professional Responsibility for Court Interpreters of the State of Connecticut Judicial Branch, Canon 7, p. 4, available at https://www.ncsc.org/__data/assets/pdf_file/0032/19697/connecticut-interpreter_code_of_ethics_commentary_2010_02.pdf (last visited June 11, 2024). Because the investigator had no known qualifications as a translator and was not operating within a framework of enforceable ethical obligations, I cannot conclude that she was competent to translate the complainant's Spanish language journals into English, much less to review those journals for *Brady* material.

Even if the state's lay investigator otherwise had been qualified by virtue of her legal training, knowledge of the evidence in the case, exercise of judgment, language proficiency, and ethical obligations to review the complainant's Spanish language journals for *Brady* material, there is no indication that adequate policies and procedures existed "to [ensure the] communication of all relevant information" to the individual prosecutors trying the case. (Internal quotation marks omitted.) *Kyles* v. *Whitley*, supra, 514 U.S. 438; see, e.g., *Fontenot* v. *Allbaugh*, 402 F. Supp. 3d 1110, 1165 (E.D. Okla. 2019) ("[t]he lack of any organizational structure or policy ensuring the proper disclosure of exculpatory and impeachment evidence from the [state and local law enforcement agencies] to the . . . [d]istrict [a]ttorney's [o]ffice resulted in systemic *Brady* violations"), aff'd sub nom. *Fontenot* v. *Crow*, 4 F.4th 982 (10th Cir. 2021), cert. denied, U.S. , 142 S. Ct. 2777, 213

State *v.* Andres C.

L. Ed. 2d 1015 (2022). The prosecutors themselves did not read the journals; nor were they able to do so—they did not understand Spanish. The investigator neither produced a written translation nor read the journals in translation aloud to the prosecutors. The prosecutors consequently were unable to effectively supervise, verify, question, or override the investigator's *Brady* determinations. Instead, the prosecutors relied entirely on the investigator to read the complainant's Spanish language journals and to identify potential *Brady* material. In the face of this wholesale delegation of the prosecutors' constitutional duty of review, the majority resorts to euphemisms, referring to the investigator as providing "help" or "assistance" to the prosecutors. This characterization is accurate only if we can agree that the investigator helped and assisted by *conducting* the *Brady* review.[20] The simple truth is that the prosecutors did not review the complainant's Spanish language journals—they delegated this task entirely to their bilingual investigator. The only *Brady* related decisions made by the prosecutors were those that the investigator, in her uninformed discretion, chose to bring to their attention.[21] The prosecutors' wholesale delegation of their

[20] As Justice D'Auria puts the point in his concurrence and dissent, "[t]he investigator reviewed the journals. Period. The prosecutors did not." Footnote 2 of the concurring and dissenting opinion. Regardless of the euphemistic terminology employed by the majority, this is the very "definition of 'delegating' review of the journals." Id.

[21] The record reflects that the prosecutors learned about a very small portion of the information contained in the complainant's Spanish language journals because four pages were translated into English and communicated to the prosecutors, who, in turn, submitted them to the trial court for an in camera inspection out of an "abundance [of] caution . . . ." Significantly, the prosecutors repeatedly represented to the court that these four pages did *not* contain any *Brady* or exculpatory material but, instead, were subject to in camera review under General Statutes § 54-86f (a) because they involved evidence of the complainant's sexual conduct. After reviewing the four pages, the trial court determined that one of the pages did, in fact, contain favorable material under *Brady* because it could be used to impeach the complainant's testimony regarding the reason for her delayed disclosure of the sexual abuse. In other words, of the four journal pages that were translated into English, the record demonstrates conclusively that one of

State *v.* Andres C.

responsibility under *Brady* to assess the substance of these crucially important documents—material that realistically could have contained information determinative of the complainant's credibility and the outcome of the case—was an abdication of their prosecutorial function and a dereliction of their constitutional duty. See, e.g., *United States* v. *Price*, 566 F.3d 900, 903 (9th Cir. 2009) ("a prosecutor cannot evade [his or her] duty simply by becoming or remaining ignorant of" *Brady* material).[22]

To support its conclusion to the contrary, the majority relies on "persuasive authority [holding] that a prosecutor does not have a constitutional obligation to

those pages contained *Brady* material that went unrecognized and unacknowledged by the prosecutors. This fact does not inspire confidence in the prosecutors' own ability to identify *Brady* material, which further casts doubt on the propriety of delegating that responsibility to a nonlawyer instructed by the prosecutors and bolsters my conclusion that the state's *Brady* review was inadequate in this case.

The majority acknowledges that "the [prosecutors'] statement that the four pages contained no *Brady* material was not correct" but concludes that, "even if the prosecutor[s] may have made a mistake in [their] *Brady* analysis on one document, that would not demonstrate conclusively that [they] did not understand [their] obligations under *Brady*." Footnote 27 of the majority opinion. Conclusive or not, the *only* evidence in the record of the prosecutors' understanding of *Brady* is an instance in which they got it wrong. Because the investigator's understanding of what constitutes *Brady* material necessarily was dependent on and derivative of the prosecutors' understanding, one can only conclude that the investigator labored under the same misunderstanding as her instructors. The majority misses the point by taking comfort in the fact that, even if the prosecutors' understanding of *Brady* was flawed, the trial court nonetheless undertook a proper *Brady* review of the four pages of material submitted by the prosecution. The issue is not whether the trial court properly applied *Brady*; it is whether the prosecutors and their investigator did, and, on this record, the evidence indicates that they did not. This fact demonstrates why in camera review by the trial court of the entirety of the complainant's journals is required to ensure that the defendant received a fair trial consistent with *Brady a*nd its progeny.

[22] I do not suggest that the prosecutors acted deliberately in this regard. These decisions were made in the midst of trial under unforeseen and unusual circumstances that took everyone by surprise, and there is nothing to suggest that the prosecutors intended to evade their constitutional obligation under *Brady* or otherwise act improperly.

State *v.* Andres C.

personally review materials in the government's possession to determine whether disclosure is required under *Brady*.'' Part II of the majority opinion, citing *United States* v. *Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992), *United States* v. *Smith*, 552 F.2d 257, 262 (8th Cir. 1977), and *Stacy* v. *State*, 500 P.3d 1023, 1038 (Alaska App. 2021). These few cases provide exceedingly weak authority for this court to rely on in rendering its decision. They are not binding on this court and are persuasive only insofar as we agree with their legal analysis, logic, and reasoning. More to the point, regardless of whether we agree with the general principles expressed in these cases, they are plainly distinguishable from the present circumstances, and their reasoning has no application to the operative facts in this case. *Jennings*, *Smith*, and *Stacy* all involve *Brady* material allegedly contained in the personnel files of other governmental agencies, rather than a complainant's firsthand description of the alleged crimes written in her own hand in a set of journals held in the prosecutors' possession. See *United States* v. *Jennings*, supra, 1492 n.3 (federal law enforcement personnel files); *United States* v. *Smith*, supra, 261 (same); *Stacy* v. *State*, supra, 1038 (personnel files in possession of state and local law enforcement agencies). Personnel files pose unique challenges with respect to prosecutors' fulfillment of their *Brady* obligation because there are many ''state statutes and local policies mak[ing] police personnel files so confidential that not even the prosecutor can look inside them to search for *Brady* material.'' J. Abel, ''*Brady*'s Blind Spot: Impeachment Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team,'' 67 Stan. L. Rev. 743, 762 (2015); see, e.g., *People* v. *Superior Court*, 61 Cal. 4th 696, 709–11, 377 P.3d 847, 206 Cal. Rptr. 3d 606 (2015) (California statute precludes both prosecutors and defense attorneys from personally accessing law enforcement personnel files unless certain proce-

State *v.* Andres C.

dures are followed consistent with *Pitchess* v. *Superior Court*, 11 Cal. 3d 531, 522 P.2d 305, 113 Cal. Rptr. 897 (1974)); see also, e.g., *Stacy* v. *State*, supra, 1038 ("state personnel files are confidential under Alaska law," and prosecutor could not personally review them). Given the confidentiality of personnel files and the lack of direct prosecutorial access to search such files for *Brady* material, many states have adopted policies and procedures to ensure that the agency maintaining custody and control of these files searches them for *Brady* material and then communicates any such material to the prosecutors trying the case. See, e.g., *Stacy* v. *State*, supra, 1038 ("[t]he Anchorage Police Department (APD) and the Department of Law (DOL) have agreed to an [ongoing] process by which the APD will advise one [DOL] representative . . . of its substantiation of an officer's or employee's misconduct involving untruthfulness or bias . . . to facilitate compliance with the duty of [the] police and prosecutors under *Giglio* while respecting the officer's or employee's privacy interest in the confidential personnel records"); *People* v. *Superior Court*, supra, 721 ("the police department has laudably established procedures to streamline the *Pitchess/Brady* process," pursuant to which "[i]t notified the prosecution, which in turn notified the defendant, that the officers' personnel records might contain *Brady* material"); see also *United States* v. *Jennings*, supra, 1492 n.3 (noting existence of United States Department of Justice policy requiring "the files of law enforcement officers . . . to be examined by the appropriate agency's attorney or his staff . . . [who] will notify the federal prosecutor assigned to the case if any potential *Brady* material is found").

Wholly apart from the unique legal status of personnel files in the possession of other state agencies, the task of reviewing personnel files for impeachment material normally is a simple and focused exercise raising none

State *v.* Andres C.

of the challenges involved in the present case. This case does not involve the ministerial review of a testifying witness' personnel file to identify disciplinary information. The material at issue in the present case contains the complaining witness' own narrative description of the sexual abuse she claims to have suffered at the hands of the defendant. These journals cover the very same events that lie at the heart of the state's case and the complainant's trial testimony. Regardless of whether the journals ultimately are determined to contain *Brady* material, their contents, as described by the complainant herself, present the reviewer with judgment calls regarding the obligation to disclose under *Brady*. No legal privilege attaches to these materials, and they are in the actual possession of the prosecutors, which makes them physically available for their direct review. I have found no case law, and the majority cites to none, standing for the proposition that prosecutors may delegate their duty to review a complaining witness' description of the crimes charged for *Brady* material to a nonlawyer staff member. And for good reason. It is a quintessential prosecutorial function to review for impeachment material a complainant's written, firsthand account of the crimes with which the defendant has been charged and to compare that written, firsthand account to the complainant's trial testimony to determine whether there are any discrepancies, evasions, inconsistencies, or omissions in the complainant's description of events that could be used to impeach her credibility. Such a nuanced task requires the legal training, experience, skill, and judgment of an attorney familiar with the operative legal claims and defenses, as well as the facts of the case, all viewed through the lens of *Brady*'s constitutional requirements. A layperson simply is not equipped to conduct the sophisticated and technical legal analysis that *Brady* requires in this context. See Practice Book § 2-44A (a) (2) (defining "[t]he

State *v.* Andres C.

practice of law'' as ''ministering to the legal needs of another person and applying legal principles and judgment to the circumstances or objectives of that person,'' including ''[g]iving advice or counsel to persons concerning or with respect to their legal rights or responsibilities or with regard to any matter involving the application of legal principles to rights, duties, obligations or liabilities'').

Lastly, this is not a case involving a large ''volume of records'' necessitating an ''extraordinary [delay] in the trial'' to permit the prosecutors to review the complainant's journals. Part II of the majority opinion. The complainant's journals total 333 pages, and a member of the two lawyer prosecution team surely could have reviewed an English language translation of the journals during trial, especially given that there was a nine day break in the trial proceedings.[23] Even if the complainant's journals were more voluminous, ''the state's obligation under *Brady* does not vary depending on how convenient or inconvenient it is for the state to comply with its duty to provide exculpatory evidence to the defendant.'' (Footnote omitted.) *State* v. *Guerrera*, 331 Conn. 628, 656–57, 206 A.3d 160 (2019) (*McDonald, J.,* concurring). In the ''context of [a] 'voluminous mass of files, tapes and documentary evidence' in [the] state's possession . . . 'the prosecutor retains the constitutional obligation of initially screening the materials before him and handing over to the defense those items to which the defense is unquestionably entitled under *Brady*' . . . .'' Id., 657 (*McDonald, J.,* concurring), quoting *Emmett* v. *Ricketts*, 397 F. Supp. 1025, 1043 (N.D. Ga. 1975).

For the foregoing reasons, on this record, I conclude that the investigator's review of the complainant's jour-

---

[23] Due to the illness of the trial judge, there were no trial proceedings from February 16 through 24, 2019.

State *v.* Andres C.

nals for *Brady* material was not constitutionally adequate, and, therefore, the journals were suppressed (i.e., withheld) within the meaning of *Brady*.[24] In a case such as this one, in which the defendant has made a plausible showing that specifically identified, suppressed evidence may contain *Brady* material,[25] but the evidence has not been reviewed by the prosecutor, defense counsel, or the trial court, the appropriate remedy is to remand the case to the trial court for in camera review.[26]

---

[24] In light of my conclusion, I see no need to adopt the prophylactic rule proposed by the defendant.

[25] The majority does not address whether the complainant's journals were unlawfully suppressed by the prosecutors because, it asserts, the defendant "claims only that the procedure that the [prosecutors] used to review the journals was constitutionally inadequate." Footnote 28 of the majority opinion. The majority's unjustifiably narrow construction of the defendant's claim overlooks the fact that the defendant challenges both the procedure used to review the complainant's journals and the prosecutors' refusal to disclose the journals to the defendant, even though there was a reasonable basis to believe that they contained favorable impeachment material. Given that defense counsel requested the complainant's journals as soon as their existence came to light, the trial court ordered the prosecutors to take possession of the handwritten journals and to review them for *Brady* material, the journals were in the exclusive possession and control of the prosecutors, and the prosecutors refused to disclose the journals to the defendant, there is no doubt that the journals were suppressed within the meaning of *Brady*. See, e.g., *Demers* v. *State*, supra, 209 Conn. 153–54 (concluding that evidence was suppressed within meaning of *Brady* because state "had both access to and control over the documents" (internal quotation marks omitted)).

[26] The defendant claims that a *Brady* violation is patent on the face of the record because the complainant testified that her journals contain a history of the defendant's sexually abusive conduct, and, therefore, the journals either contain inculpatory evidence or contain no such inculpatory evidence and constitute impeachment material. The defendant oversimplifies the issue. *Brady* requires the disclosure of material, favorable evidence, not inculpatory evidence. Favorable evidence includes impeachment material, such as prior inconsistent statements and evidence of bias, motive, interest, and reputation for truthfulness. It is possible (albeit unlikely) that the complainant's journals contain no impeachment material because her description of the defendant's sexually abusive conduct may be entirely consistent with her trial testimony. It is also possible that the journals contain statements that are inconsistent with her trial testimony and, thus, constitute impeachment material. Notably, impeachment material includes, but is not limited to, new inculpatory information like additional instances of sexual abuse or additional details regarding the sexual abuse to which

State *v.* Andres C.

See, e.g., *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 57–58,
107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) (when "it is impossi-
ble to say whether any information" is required to be
disclosed under *Brady* because neither prosecutor,
defense counsel, nor trial court reviewed information,
defendant is "entitled to have the [information] reviewed
by the trial court" in camera to determine whether it
contains *Brady* material); *United States* v. *Alvarez*, 358
F.3d 1194, 1209 (9th Cir.) ("[b]ecause neither we nor the
trial court know what it is we are attempting to review
[for a *Brady* violation]," appropriate remedy is to "remand
to the [trial] court for an evidentiary hearing to determine
whether the government had discharged its obligation to
provide the defense with material exculpatory evidence,
including impeachment evidence, within its possession"
(internal quotation marks omitted)), cert. denied sub nom.
*Valenzuela* v. *United States*, 543 U.S. 887, 125 S. Ct. 126,
160 L. Ed. 2d 148 (2004); *United States* v. *Rosario-Peralta*,
175 F.3d 48, 56–57 (1st Cir. 1999) (retaining jurisdiction
over appeal and remanding case to trial court to review
specifically identified evidence in camera to determine
whether *Brady* required its disclosure); *United States* v.
*Kiszewski*, 877 F.2d 210, 215–16 (2d Cir. 1989) (when "the
jury's verdict turned on the credibility" of witness for
whom alleged impeachment material had not been dis-

the complainant testified at trial, which would be a substantial and material
omission from the complainant's trial testimony. See, e.g., *State* v. *Reed*,
174 Conn. 287, 303, 386 A.2d 243 (1978) ("[i]f a former statement fails to
mention a material fact presently testified to, which it should have been
natural to mention in the prior statement, the prior statement is sufficiently
inconsistent" to constitute impeachment evidence (internal quotation marks
omitted)); cf. *State* v. *Carrion*, 313 Conn. 823, 835–36, 842, 100 A.3d 361
(2014) (trial court properly admitted video-recorded interview of child victim
of sexual abuse as inconsistent statement because her trial testimony "was
often inconsistent with the details [that] she [had] provided during her
[video-recorded] interview" (internal quotation marks omitted)). It is not
clear what information the journals contain, and that is why we must remand
the present case for the trial court to order a translation of the journals
and to examine them in camera for favorable information required to be
disclosed to the defense pursuant to *Brady*.

State *v.* Andres C.

closed, it was "necessary to remand [the] case to allow the [trial] court to conduct an in camera examination of the [evidence] to determine whether [it] should have been disclosed and, if so, whether [the defendant] is entitled to a new trial").[27]

Despite the significant risk that the defendant was deprived of his constitutional right to a fair trial, the majority declines to address whether the prosecutors' delegation of their duty to review the complainant's Spanish language journals for *Brady* material was constitutionally adequate on the present factual record, reasoning that (1) the defendant only requested a prophylactic rule and did not expressly raise a "freestanding" *Brady* claim, and (2) the record is inadequate for review under the second prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Part II of the majority opinion. The majority's characterization of the defendant's claim as something other than a *Brady* claim misapprehends the fundamental issue on appeal. The issue certified on appeal is whether "the *Brady* review . . . of the complainant's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate . . . ." (Citation omitted.) *State* v. *Andres C.*, 342 Conn. 901, 270 A.3d 97 (2022). Consistent with the certified question, the defendant claims that the investigator's *Brady* review was not constitutionally adequate in this case because the state's lay investigator was not qualified to review the complainant's Spanish language journals for *Brady* material, resulting in a deprivation of the defendant's due process right to a fair trial and necessitating the reversal of his conviction. The majority cannot mean that any claim alleg-

---

[27] Additional federal authority exists, such as the cases cited by Justice D'Auria in part IV of his concurrence and dissent. The majority's assertion that this federal authority is distinguishable because, in the present case, the defendant does not claim on appeal that the state "refused [his] request to review specific evidence for *Brady* material" fails to confront the essence of the defendant's argument. Footnote 21 of the majority opinion.

State *v.* Andres C.

ing an improper delegation of a prosecutor's duty to conduct a constitutionally adequate review for *Brady* material is deficient as a matter of law. Would we say that no "freestanding" *Brady* claim exists if a defendant challenges a prosecutor's use of a high school civics class to conduct the *Brady* review? The methodology used to review information for potential *Brady* material is inextricably intertwined with the integrity, reliability, and legal sufficiency of that review.

Instead of addressing the merits of the claim certified for appellate review and briefed on appeal, the majority knocks down a straw man by focusing exclusively on the defendant's request for relief, namely, a "prophylactic," federal constitutional rule requiring the prosecutor *in all cases* personally to review potential *Brady* material that comes to light during trial.[28] The defendant's request for such a rule must be placed in the broader context of his claim on appeal. The defendant does not contend that a prosecutor's personal duty to review information for *Brady* material never is delegable; nor does he need to make such an absolutist claim to be entitled to relief. Instead, the defendant claims that the delegation was unconstitutional *in this case* because the complainant's Spanish language journals surfaced midway through the trial, after the complaining witness had completed most of her trial testimony. The defendant acknowledges the "administrative and practical problems [that] could arise from a requirement that *all* documents be personally reviewed by prosecutors, particularly since *Brady* [review] can occur long before trial, and may involve

---

[28] The defendant's request for a prophylactic rule may have been unnecessary and inartful, but it does not preclude appellate review of his as applied *Brady* challenge. The majority's characterization of the defendant's claim as one seeking only a prophylactic rule and not making a case-specific challenge is also impossible to square with the defendant's allegation that there was not just the *risk* of a *Brady* violation, but an *actual Brady* violation patent on the face of the evidentiary record in this case. See footnote 26 of this opinion.

documents generated by, or in the possession of, different government agencies.'' (Emphasis in original.) The defendant makes it clear that he ''was not and is not asking for an expansive *Brady* rule of general applicability but is seeking a limited rule to the effect that a prosecutor must personally review potential *Brady* material when that material is first discovered or uncovered during the course of the trial.''

In my view, we need not decide whether to adopt the prophylactic rule sought by the defendant because a narrower holding is sufficient to remedy the constitutional inadequacy of the *Brady* review conducted in this case. We are not bound by the scope of relief requested by the defendant. Indeed, we have the inherent authority and obligation to fashion a narrower rule consistent with the general principle ''that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.'' *United States* v. *Morrison*, 449 U.S. 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981); see *Dayton Board of Education* v. *Brinkman*, 433 U.S. 406, 420, 97 S. Ct. 2766, 53 L. Ed. 2d 851 (1977) (''[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation'' (internal quotation marks omitted)). No principle of law or logic supports the idea that the defendant's request for greater relief precludes this court from granting more circumscribed relief.

As for the adequacy of the record, ''[a] record is not inadequate for *Golding* purposes because the trial court has not reached a conclusion of law if the record contains the factual predicates for making such a determination.'' (Internal quotation marks omitted.) *State* v. *Rosa*, 196 Conn. App. 480, 499, 230 A.3d 677, cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020). ''Nevertheless, [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred,

State *v.* Andres C.

we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim.'' (Internal quotation marks omitted.) Id.; see id., 499–500 (concluding that record was adequate to review defendant's unpreserved *Brady* claim); see also *State* v. *McCoy*, 331 Conn. 561, 598, 206 A.3d 725 (2019) (''this court has regularly entertained claims of *Brady* violations that were not distinctly raised at trial, as long as those claims satisfied *Golding*''); *State* v. *Bryan*, 193 Conn. App. 285, 312–14, 219 A.3d 477 (reviewing unpreserved *Brady* claim under *Golding*), cert. denied, 334 Conn. 906, 220 A.3d 37 (2019).

The pertinent facts are not disputed, unclear, or ambiguous, and the record is sufficient to permit appellate review. The complainant's Spanish language journals were marked and sealed as an exhibit and thus have been preserved for translation and review. The record is equally clear that neither of the prosecutors understood the Spanish language and that they could not review the handwritten journals for potential *Brady* material themselves. Because the prosecutors decided to delegate this task in its entirety to their bilingual investigator, they were acutely aware that it was important to establish the qualifications of the investigator conducting the *Brady* review. To this end, the prosecutors detailed those qualifications on the record, explaining that the investigator was bilingual, had been employed by the state's attorney's office for fifteen years, five of which had been spent as an investigator, and had graduated from Albertus Magnus College in 2013 with a major in criminal justice.[29] As for the instructions that the investigator had

[29] The majority offers hypothetical examples of situations in which a blanket prohibition on delegation would be inappropriate. See part II of the majority opinion. Those hypotheticals serve only to illustrate that the delegation was improper on the facts of *this* case. In this case, the state's investigator was not a paralegal, much less ''a highly experienced paralegal who has been trained in the requirements of *Brady* and who sat by the prosecutor's side during the entire trial . . . .'' Id. Nor was the investigator ''a supervising prosecuting attorney who had been supplied with the transcript of the

State *v.* Andres C.

been provided, the prosecutors explained that the investigator had been "instructed very carefully . . . as far as what she was looking for . . . [and] what the state's obligation is for exculpatory and *Brady* material," and that the investigator had "spent about ten hours reviewing these materials . . . and, whenever she had any questions, she would talk to" the prosecutors assigned to the case. The record makes it clear that the prosecutors performed no active oversight of the review process and left it to the investigator to come to them with questions.

The relevant qualifications of the state's investigator are clear from the record. The prosecutors expounded on the investigator's education, experience, and training, and it is both counterintuitive and speculative to think that the prosecutors would have omitted additional pertinent information, such as specialized training and experience in *Brady*'s requirements or the translation of foreign language documents. Reviewing the same record, the Appellate Court rightly held that "[t]he record is adequate and the defendant's claim is of constitutional magnitude, and, thus, the first two *Golding* prongs are satisfied." *State* v. *Andres C.*, supra, 208 Conn. App. 856. It is highly significant that the state does not claim otherwise; nor does the state suggest that additional information regarding the investigator's qualifications exists or that further fact finding may be necessary to supplement or augment the record. To the extent that the defendant's *Brady* claim is unpreserved, it is reviewable under *Golding*.[30]

proceedings . . . ." Id. The state's investigator was a nonlawyer layperson with no apparent legal training, experience, or knowledge of the constitutional requirements of *Brady* or the complainant's prior statements or testimony.

[30] As the majority acknowledges, defense counsel asked for an immediate, in camera review of the complainant's Spanish language journals for exculpatory material when their existence first was disclosed at trial. See footnote 21 of the majority opinion. Because the trial court and the state were on notice of the defendant's *Brady* claim, I fail to see why the defendant should be required to renew his request for a second time to preserve it for appellate review. See, e.g., *State* v. *Best*, 337 Conn. 312, 317 n.1, 253 A.3d 458 (2020)

State *v.* Andres C.

The majority's conclusion to the contrary is in "derogation of [a criminal defendant's] rights under *Golding*." *State* v. *Rosa*, supra, 196 Conn. App. 501. *Golding*, which "is a narrow exception to the general rule that an appellate court will not entertain a claim that has not been raised in the trial court," is premised on the animating principle that, "because constitutional claims implicate fundamental rights, it . . . would be unfair automatically and categorically to bar a defendant from raising a meritorious constitutional claim that warrants a new trial solely because the defendant failed to identify the violation at trial." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 749, 91 A.3d 862 (2014). This doctrine is not available in federal court, and, therefore, the majority's reliance on federal case law to hold that *Brady* claims must be preserved in the trial court or forfeited on appeal is misplaced and undermines the foundational principles on which *Golding* rests. See, e.g., *State* v. *McCoy*, supra, 331 Conn. 598 ("the trial court is [not] the *only* court that can review a *Brady* claim"; appellate courts can review *Brady* claims under *Golding* (emphasis in original)); *State* v. *Rosa*, supra,

_____

(claim was "functionally preserved" in trial court because it was articulated with sufficient clarity to put trial court on notice); *State* v. *McKethan*, 184 Conn. App. 187, 194 n.2, 194 A.3d 293 (defendant's claim was preserved because "the trial court was placed on reasonable notice of the claim"), cert. denied, 330 Conn. 931, 194 A.3d 779 (2018). Regardless, even if the defendant's *Brady* claim is unpreserved, it nonetheless is reviewable under *Golding* because it is a claim of constitutional magnitude, and the record is adequate for review. With respect to the adequacy of the record, I join Justice D'Auria's observation that, "when it comes to *Brady* claims, this court has even pressed beyond the dictates of *Golding*'s first prong . . . at times ordering limited remands to supplement the record so that a reviewing court can determine if the state has complied with its affirmative constitutional obligation under *Brady*." Part IV of the concurring and dissenting opinion. On the present record, there is no reason why we cannot, and every reason why we can and should, exercise our discretion to remand the case to the trial court for the limited purpose of ordering an official English language translation and in camera review of the complainant's journals for *Brady* material.

501 (there is no "inviolable rule that any *Brady* claim must first be fully presented and preserved in the trial court or be deemed waived").

For the foregoing reasons, I would retain jurisdiction over the present appeal and remand the case to the Appellate Court with direction to remand it to the trial court to order the journals translated into English and to review the translated journals in camera for potential *Brady* material. See, e.g., *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006) (appellate courts may remand case to trial court for hearing to determine whether *Brady* violation exists pursuant to their supervisory authority under Practice Book § 60-2); *State* v. *Gonzales*, 186 Conn. 426, 435–36, 441 A.2d 852 (1982) (remanding case to trial court to determine whether witness' prior statement was required to be disclosed to defense); see also Practice Book § 60-2 (this "court may, on its own motion . . . (1) order a judge to take any action necessary to complete the trial court record for the proper presentation of the appeal . . . [or] (8) remand any pending matter to the trial court for the resolution of factual issues where necessary"). Remand to the trial court is appropriate because that court is "already familiar with the matter" and can rapidly resolve the "fact sensitive constitutional issues" embedded in the defendant's *Brady* claim. *State* v. *Ortiz*, supra, 714 n.17. If a dispute between the parties regarding the disclosure of the journals still exists following the trial court's in camera inspection of the translated journals and its issuance of a memorandum of decision, then we may request supplemental briefing and review that dispute on appeal. See, e.g., *State* v. *Davis*, 338 Conn. 458, 478–79, 258 A.3d 633 (2021); *State* v. *Pollitt*, 199 Conn. 399, 416–17, 508 A.2d 1 (1986). In the absence of further review of the complainant's journals for mate-

State *v.* Andres C.

rial, favorable evidence, however, I cannot conclude that the defendant received a fair trial in accordance with his due process rights under *Brady*. I therefore dissent.